IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| AVRIL L. WILSON, | ) C.A. # 3:17-cv-00447-MGL-TER |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| UNIVERSITY OF SOUTH CAROLINA, | ) |
| BOBBY GIST AND RHONDA EDWARDS, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**PLAINTIFF'S RESPONSE TO DEFENDANTS**

**MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

The Plaintiff, Avril L. Wilson, hereby responds in opposition to the Defendants' Motion for Summary Judgment by and through her attorney, Bonnie Travaglio Hunt of Hunt Law, LLC. The Defendants claim that the Plaintiff has filed a meritless lawsuit and they should be granted summary judgment on all causes of action.  However, the Defendants has no idea the environment that the Plaintiff was subjected to and ignored her pleas for help.  The Defendants contend that the Plaintiff's evidence is merely conclusory, generalized opinions.  However, based on the actual review of the evidence the Plaintiff was subjected to actual discrimination, retaliation and a hostile work environment.

The Plaintiff can present evidence that she was discriminated against based on Age in violation of the Age Discrimination in Employment Act, Race Discrimination in violation of Title VII, Retaliation for her complaints and subjected to a hostile work environment, Hostile Work Environment based on Age and Race Discrimination in violation of Title VII and Age

1

Discrimination in Employment Act.  The Plaintiff can further show that the Defendants Breached the contract of employment with Fraudulent Intent to mislead and harm her so that she would not file a complaint with the EEOC to not tarnish Mr. Gist's record with the University.  The Plaintiff can further show that USC negligently supervised its employees in the EEO department which lead to further harm for the Plaintiff including but not limited to Intentional Infliction of Emotional Distress.  The Defendants' rational for granting summary judgment is not based on law but based on their interpretation of the facts not in a light most favorable to the Plaintiff.  The Defendants' Motion for Summary Judgment should be denied on all causes of action as the Defendants has failed to present any evidence that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law.  The facts when taken as a whole show that the Defendants have failed to present the facts in a light most favorable to the Plaintiff.  The Defendants are not entitled to Summary Judgment.

## II.    PROCEDURAL HISTORY

On July 12, 2016, the Plaintiff filed a charge of Discrimination with the South Carolina Human Affairs Commission alleging Discrimination based on Race in violation of Title VII, Age Discrimination in violation of the Age Discrimination in Employment Act and Retaliation in violation of Title VII and the Age Discrimination in Employment Act.   The Charge of Discrimination set forth the following:

> "I have been subjected to harassment, intimidation, and disparate terms and conditions from on or about May 30, 2013, through on or about July 5, 2016 and continuing.  I have been subjected to a hostile work environment by my colleagues (younger, white) who have bullied, isolated and refused to train me; and management (white) who has allowed the harassment to continue, subjected me to harsher standards of performance and stricter

2

disciplinary measures, verbally reprimanded me in the presence of my co-workers and denied me the resources and training necessary to complete my job requirements. I complained to Human Resources and the EOP office, but instead of taking correct action. I was involuntarily transferred and demoted to a less favorable position lacking the opportunity for professional growth and development.

Therefore, I believe I have been discriminated against based on my race (black), age (48) and in retaliation for my opposition to employment practices declared unlawful by the SC Human Affairs Law, as amended Title VII of the US Civil Rights Act of 1964, as amended, and the US Age Discrimination in Employment Act of 1967, as amended."[1]

The South Carolina Human Affairs Commission issued a right to sue to the Plaintiff on November 7, 2016. That the South Carolina Human Affairs Commission issued its right to sue stating that they found: "No Cause: The commission is unable to conclude, based upon the information obtained during its investigation, that there has been a violation of the Human Affairs Law, Section 1-13-10, et seq, of the SC Code of Laws of 1976, as amended.[2]

The Plaintiff filed an appeal of the determination with the South Carolina Human Affairs Commission. Under Section 16.01.76 of the Equal Employment Commission's (EEOC) Regulations, you are entitled to request that EEOC perform a substantial Weight Review of this agency's No Cause Determination. The Plaintiff sent the request within the 15 days of the date as required.[3] The letter was sent to the EEOC November 13, 2016 setting forth the reasons for the

---

[1] *Exhibit 1 to Plaintiff's Response in Opposition, SCHAC and EEOC Documents, Exhibit 3 to Plaintiff's Response in Opposition to, Plaintiff's Affidavit.*
[2] *Id, Exhibit 1.*
[3] *Exhibit 1 to Plaintiff's Response in Opposition, SCHAC and EEOC Documents, Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*

request for the substantial weight review.  The letter stated the following as to why the SCHAC

was wrong in the determination of No cause:

1. *"SHAC reports that my witnesses could not substantiate my allegations against the    respondent.   They were not witnesses to what you alleged in your charge.   Several witnesses were not employed during the relevant time frame of your allegations and therefore could not say for certain you were discriminated against."  This statement is unfair and biased as it was not my witnesses charge to substantiate my claims but the Office of Equal Opportunity Programs (EOP).  Had the University office of EOP acted responsibly and investigated my claims, they would have, by law, been able to prove or disprove the allegations made by me.  By the mere fact that the EOP office chose to purposely, recklessly and negligently ignore my claims of discrimination because it was in Bobby Gist's best interest to keep his resolution numbers in the positive, my case did not get the attention it needed or deserved.  Therefore, the investigation of the SHAC office should have been able to conclude that, but for lack of investigation by the USC EOP office, the allegations could have and would have been proven.  The witnesses that were not employed during my discrimination had also reached out to EOP with similar allegations of their own and Bobby Gist and his team turned a blind eye and ignored their claims as well.   As such, not only are the claims provable and true, the mere fact that I was relocated numerous times without the benefit of an investigation by the EOP office, which by law should have been conducted because there was a claim of discrimination proves the same.  The supporting evidence proves the discriminatory way in which I was treated by management and my colleagues, the continuing reduction in duties and responsibilities, one or more of my witnesses could and did prove my claims were true, several emails submitted also support my continuous claims of discrimination.  By Title VII law, if it can be proven that the area or department in question has had similar issues treating people in the same class in a disparate manner, which the University Development Department did, also gives credence to my submitted claims.  Bobby Gist and his team have had numerous complaints from other black employees with claims of being treated in a discriminatory manner at USC and he has to this day chosen to mislead them as well.   Unfortunately, after being misled, misguided and fraudulently advised by Bobby Gist and his team for so long, many left the university.  Bobby*
*Gist ill advised me many times and told me to just leave the University if I did not like the way I was being treated.  At no time did Bobby Gist or his Investigator, Rhonda Edwards, who should be well aware of Title VII law in their respective positions, inform me that I was experiencing Title VII discrimination by name.  He is a fraud and has never done anything to help me with my case for the past three years I filed claims of discrimination, retaliation and etc.   The purpose of my witnesses was to add to the already proven and provided information which substantiated my claims of being discriminated against and a seasoned SHAC investigator and the Commission should have been able to determine this.*

2.   *"SHAC reports that the alleged harassment was not severe or pervasive."*
*This statement only proves that its obvious that no one has chosen to do an
investigation as, the treatment I received was targeted towards me because I was
the only black and a woman over 40 in the area that I was assigned to the
harassment was severe in nature and I constantly, consistently stated such. Based
upon the definition of "Pervasive" (Especially of an unwelcome influence or
physical effect; spreading widely throughout an area or a group of people) they
had no other black woman over 40 in the area to treat the way I was being treated
which was discriminatory and hostile, and the like as stated in my numerous claims.
No more than it makes sense that they would use the word "pervasive" to mislead
one to think this treatment did not happen to me because it was not widespread,
then the reverse would also have to be true. The 10% increase they gave to me and
the group that treated me discriminatorily to cover their deceptive acts wasn't
widespread either. No other group within Development outside of the group that
treated me discriminatorily received the bogus 10% increase and 10% is what I
received. What is more telling is, based upon me having absolutely nothing to do
most days due to the reduction in my work load, why was I suddenly given a raise?
I know for a fact that myself and one Caucasian in the area I work in received a
raise. After speaking with other employees in the "widespread" area, not one of
them received an increase which I confirmed with one other black employee. Based
upon those facts alone, I did not have any say so about the meager raise I received
and it was in no way compensation for the violations committed against me and
certainly not appropriate for discrimination. Not to mention, I was not given a
raise for the position I was hired to do but for the position I currently held. It is
impossible to fathom how anyone could conclude that I was not treated in a severe
manner when every report made by me clearly and concisely states the level of
treatment as such. Furthermore, to relocate me numerous times due to no fault of
my own from a position in which I applied, was hired and enjoyed because the
University refused to adhere to and abide by its own Policies, Procedures, Rules
and Regulations is and of itself severe and violated my Civil rights and the terms
and conditions of my employment. This account of the facts from the Commission
is only an attempt to diminish the effects of the disparate and discriminatory
treatment I received from USC, its management and the EOP agents.*

3.   *"SHAC reports that the respondent engaged in an interactive process with
me. The respondent assisted you in finding another area to work in to remove you
from the coworkers causing you distress."  It is utterly and painfully obvious that
no one has bothered to read the University's Policy and Procedures on
Discrimination, EOP 1.03 and the Equal Opportunity Policy, EOP 1.00. I applied
and was subsequently offered the position for which I applied which my acceptance
of the position is noted by my signature on May 30, 2016. The terms and conditions
of my employment were further violated which is acknowledged in SHAC's
statement stating that I was relocated due my colleagues causing me distress.
Correction, my colleges caused me distress by way of discrimination by
intimidation, hostile work environment etc.,   The investigators report fail to
acknowledge that my colleagues discriminated against me but acknowledges that I
was relocated without being given so much as a reason to substantiate the move.*

*In order for this investigation to have been properly conducted, the investigator, who should be apprised of the law, should have been able to discern that without proof of an investigation by the EOP office, which by law should have been conducted, there was no justifiable reason for me to have been relocated other than USC attempting to escape the discrimination claims made by me; the absence of an investigation proves such by law.  In essence, the SHAC investigation leads way to prove the numerous times I was relocated can be justified by my claims by not stating the lack of an investigation, the claims reported must be founded.  By failing to notate that, a cause finding should have been concluded.  Based upon the facts presented, lack of cause suggests a cover up.   I did not apply for the position of Gift Processor to be relocated without me initiating the move.   The SHAC investigator should have been able to determine that based upon the provided information, the fact that I was relocated by USC numerous times shows there was a problem and relocating me was not the proper way to resolve claims of discrimination based upon Title VII and the University's Policies, Procedures, Rules and Regulations.   Rather than deal with my colleagues who behaved discriminatorily against me, USC made the decision to relocate me, the only black female over 40, several times to cause me further frustration and distress in an attempt to get me to become discouraged and quit like the others that have been wronged by Bobby Gist and his team.  That tactic has not and will not work.*

*I respectfully ask this agency just as I asked of the SHAC, please review the file in its entirety and conclude that not only was I unfairly discriminated against and treated in a disparate and hostile manner for the past three years, I continue to be affected by the many transfers and lack of a fair and equal employment opportunity by USC.  Due to the many proven facts in this case, it is my hope and plea that the EEOC will find a cause of discrimination as alleged and sue the USC on my behalf because of the gross and negligent way the EOP agents who willfully and purposefully ignored and fraudulently handled my many claims of discrimination.  No State agency should be allowed to hide and escape charges when its agents recklessly and willfully violates the civil rights of others repeatedly and purposely.*"[4]

The EEOC failed to conduct a substantial review and issue a right to sue on January 4, 2017.[5]  That the Right to sue was specific to the Plaintiff's Charge of Discrimination 14C-2016-00800[6].

---

[4] *Exhibit 1 to Plaintiff's Response, SCHAC and EEOC Documents, Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*
[5] *Exhibit 1 to Plaintiff's Response, SCHAC and EEOC Documents, Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*
[6] *Exhibit 1 to Plaintiff's Response, SCHAC and EEOC Documents, Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*

The Plaintiff filed a second charge of discrimination EEOC Charge Number 415-2017-00227.[7]  The second charge set forth the following:

> "I have been employed with the employer since May 2013.  I previously filed a charge of discrimination with the SCHAC regarding Race Discrimination, Age Discrimination and Retaliation.  I filed several discrimination allegations with the EEO office of the University of South Carolina.  My employer failed and refused to investigate my complaints.  My employer in fact closed the complaint without investigating or notifying me of closing the complaint.
> As a result of my complaints I have been transferred to different departments.  I have been placed in my current position with a certain job description.  My employer is refusing to allow me to perform those duties and assigned them to other individuals.
> That I have been demoted from my previous position and relegated to only performing administrative duties that are limited to data entry alone.
> I have been retaliated against for my previously complaints in violation of SCHAC laws and Title VII laws.  That I have been subjected to hostile work environment as a result of my previous complaints in violation of State and Federal Law."

The SCHAC issued a right to sue on February 24, 2017.  The EEOC issued a right to sue regarding Charge No. 415-2017-00227 on May 23, 2017.[8]  The Plaintiff has commenced 2 other charges of discrimination for Race Discrimination and Retaliation.  That the Right to Sue from the EEOC adopted the findings of the State or local fair employment practices agency that investigated the charge.

The Plaintiff filed this action in Federal Court on February 14, 2017, alleging Age discrimination in violation of the Age Discrimination in Employment Act, Race Discrimination in violation of Title VII, Retaliation for her complaints regarding Race Discrimination, Age Discrimination and Hostile Work Environment, Hostile Work Environment based on Age and

---

[7] Exhibit 1 to Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment, SCHAC and EEOC Documents, Exhibit 3 to Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment, Plaintiff's Affidavit.
[8] Exhibit 1 to Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment, SCHAC and EEOC Documents, Exhibit 3 to Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment, Plaintiff's Affidavit.

Race Discrimination in violation of Title VII and Age Discrimination in Employment Act, Breach of Contract/Breach of Contract with Fraudulent Intent against USC, Gist and Edwards, Negligent Supervision of an Employee against USC and Intentional Infliction of Emotional Distress against all Defendants.

The parties have completed discovery and the Defendants have now filed its motion for summary judgment.  The Defendants filed the Motion on September 10, 2018.  The Plaintiff's original response was due on September 24, 2018.  The Plaintiff's attorney requested two extensions to respond due to hurricanes, hearings and scheduling issues.  The Court granted the Plaintiff's extension to October 18, 2018.  The Plaintiff hereby files her response to the Defendants' Motion.

### III.     LEGAL STANDARD

The Plaintiff has presented several causes of action against the Defendants.  The Plaintiff has presented facts that establish that the she is entitled to present her case to a jury.  The Defendants have set forth an argument that all the Plaintiff's causes of action should be dismissed based on the Defendants' perception of the Plaintiff's case.  It is clear from the facts that the Plaintiff has presented several genuine issues of material fact regarding employment with the Defendant, University of South Carolina.  The Plaintiff further shows that the Defendants, Gist and Edwards acted in ways contrary to common decency to delay, mislead and commit fraud against the Plaintiff.

Summary Judgment is the means by which parties can request dismissal of cases that may not meet the legal requirements of the cause of action set forth in the party's complaint.  Summary Judgment is only appropriate when the both requirements of Rule 56(c) have been met.[9]  It is clear

---

[9] *Celotex Corp. v. Cartrett, 477 U.S. 317, 106 S.Ct. 2584, 91 L.E. 2d 265, 274 (1986).*

from *Celotex* Corp that the moving party must meet both burdens in order to be granted the derisive and final rendering decision of summary judgment.  First the moving party must show that the record including depositions, written discovery, and affidavits if submitted show that there is no genuine issue of material fact.  A genuine issue of material fact is where a genuine dispute is shown to exist if sufficient evidence is presented such a reasonable fact finder could decide the issue in favor of the non-movant.[10]  The Defendant has failed to present that there is no genuine issue of Material fact in Ms. Wilson's employment considering the discrimination, work environment, differential treatment, retaliation and actions of the Defendants, Gist and Edwards.

The burden of presenting that the record contains no genuine issue of material fact is a high one and must not be merely assumed by the Court to have been met simply because the moving party has made a Motion for Summary Judgment.  Furthermore, Summary Judgment should be granted *only* where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law.[11]

An issue of material fact is defined as a genuine issue if a reasonable jury could return a verdict for the non-moving party based on the facts presented on the element at issue.[12]  If, and only if the moving party has shown that no genuine issue of material fact exists in the record as it

---

[10] *A genuine dispute is shown to exist if sufficient evidence is presented such that a reasonable fact finder could decide the issue in favor of the non-movant. Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed.Cir.1987).  In other words, a motion for summary judgment is properly granted only, "If the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A.B. Chance Co. v. RTE Corp., 854 F.2d 1307, 1310 (Fed.Cir.1988). If the moving party satisfies its burden, summary judgment must be granted unless the non-movant presents evidence sufficient to establish the existence of a genuine issue of material fact.  See SRI Int'l v. Matsushita Elec. Corp., 775 F.2d 1107, 1116 (Fed.Cir.1985).  To establish the existence of a genuine issue of material fact, the non-movant "must point to an evidentiary conflict in the record; mere denials or conclusory statements are insufficient." Id. (citing Barmag Barmer Maschinenfabrik AG v. Murata Mach., 731 F.2d 831, 836 (Fed.Cir.1984)). Whether the above standards for summary judgment have been met and whether the procedural and substantive law was correctly applied by the district court is reviewed de novo by this court. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed.Cir.1987).*

[11] *Charbonnages de France v. Smith, 597 F .2d 406, 414 (4th Cir. 1979).*

[12] *Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 106 S.Ct. 2505, 91 Led.2d 202, 212.*

stands at the time of the hearing[13] it may then go on to attempt to satisfy its second burden of proof. The second burden of proof for the moving party is met only if the moving party shows that the record (in which no genuine issues of material fact exist), even if read in a light most favorable to the non-moving party, affording the non-moving party every factual and legal inference in its favor as required in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), presents a factual scenario which cannot support the non-moving party's legal position and which must, as a matter of law, be resolved in favor of the moving party.[14]   The non-moving party's only burden is to point to specific facts in the record, which, if read in a light most favorable to the non-moving party, would show a genuine issue of material fact to exist for trial.[15]

If there appears to be no genuine issue of material fact, but the fact pattern does not squarely fit the moving party's case under existing law (all legal inferences being drawn in light most favorable to the non-moving party) the Court should deny the moving party's motion.  In such a case, it would be for the finder of fact to apply the law to the facts and determine the outcome of the case at issue.

In essence, it is the moving party's Motion, which identifies the essential elements of the claim that are being challenged.  The non-moving party then need only respond to the specific attacks of the Moving party, by pointing out facts on the record which would create genuine issues of material fact as to the challenged elements, rather than being required to prove each and every element of its claim at the Summary Judgment stage.  In the circumstances here, the Court should not grant the Defendant's motion for Summary Judgment because the fact pattern submitted to the Court does not squarely fit in to moving party's case under existing law (all legal inferences being

---

[13]   *Of course, each party has the right, pursuant to Rule 6(d) of the Federal Rules of Civil Procedure, to introduce affidavits up until one day before the hearing date.*
[14] *Fed.R.Civ.P. 56(c).*
[15] *Celotex, 91 L.ED.2d at 274, 275.*

drawn in light most favorable to the non-moving party). In this case, it is for the finder of fact to apply the law to the facts and determine the outcome of the case at issue. The Defendant has failed to present the fact in a light most favorable to the Plaintiff, failed to submit fact situations where there is no genuine issue of material fact and failed to present evidence that the Defendant is entitled to judgment as a matter of law.

In essence is it not the Plaintiff's responsibility to prove her case at this stage. The Plaintiff's only obligation is to show the Court that the Defendant's interpretation of the facts does not squarely fit into the legal analysis of the law. The facts in Ms. Wilson's case do not fit squarely into the legal analysis and therefore present a genuine issue of material fact. Therefore, the Defendant is not entitled to judgment as a matter of law.

## IV.    FACTS

In a motion for Summary Judgment, the Court is to review the facts in a light most favorable to the Plaintiff. The Plaintiff was considered an exemplary employee, performing all aspects of her position while employed with the Defendant, University of South Carolina. At no time during her employment was the Plaintiff disciplined.[16] However, the Defendant maliciously misrepresents the facts regarding the Plaintiff's claims in order to present her as a paranoid employee further perpetrating the treatment received by the Plaintiff throughout her employment. The Defendants purposefully interpret the facts in a light most favorable to the Defendants specifically avoiding the actual facts involved. The Plaintiff hereby presents the facts in a light most favorable to her as is required by the Federal Rules of Civil Procedure and case law. Based on the actual record the Plaintiff was a good employee who performed all aspects of her position and suffered severe retaliation as a result of legitimate race discrimination, hostile work

---

[16] *Exhibit 2 to Plaintiff's Response, Defendant, USC, Interrogatories Responses.*

environment and retaliation complaints.  The Defendant, Gist specifically and constantly went out of his way to brag about his EEO[17] record and intentionally delayed the Plaintiff's process in order to bolster his record of EEO Complaint as he embellished in his deposition.

1.  The Plaintiff received a job offer from the Associate Vice President of Advancement Serves on May 21, 2013 for Gift Processor.[18]

2.  The Plaintiff was hired by the Defendant, University of South Carolina, as a Program Coordinator I-Development Office as a Gift Processor on May 25, 2013.[19]  The Plaintiff was very excited about the new position and the new opportunity with the Defendant, University of South Carolina.[20]

3.  The Plaintiff's job description set forth the purpose of the plaintiff's position was to serve as a program coordinator for the Office of Advancement Services.  Plans, coordinates, distributes and ensures accurate data collection and data entry of all gifts received by the University and affiliated foundations.  Prepares daily deposit logs and generates reports for all gifts received in the Gift Processing area.  Evaluates all matching gift checks and determines if USC has received a gift from employees of a company.  Generates a daily log sheet of all gifts received in the Gift Processing area in order to track the donor's name, foundation or university the gift will be deposited into, and date the check was received. Reconciles daily batches with entries and deposit totals and updates donor information in the database.  Prepares journal entries and pledge cancellations for approval and processing.[21]  The Plaintiff signed off on the job description on May 30, 2013.[22]

---

[17] *Exhibit 5 to Plaintiff's Response, Page 45 to Defendant, Gist Responses to Requests to Produce. Exhibit 17 to Plaintiff's Response, Text Message.  Exhibit 24 to Plaintiff's Response, Excerpt from Gist Deposition.*
[18] *Exhibit 8 to Plaintiff's Response, Offer of Employment.*
[19] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*
[20] *Exhibit 11 to Plaintiff's Response, 6/24/2014 Email from Plaintiff to Colanda Foster.*
[21] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*
[22] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*

4. The Plaintiff received policies and procedures from the Defendant, University of South Carolina.[23]  The Plaintiff also received extensive training on the policies and procedures. The Policies and Procedures set forth the requirements regarding Equal Employment Opportunity, Discrimination and intolerance to any discrimination based on any protected category set forth by Federal Law, the Policy regarding Retaliation and the fact that the University would not accept any such action by any employee of the University.[24]  The Plaintiff was trained that if she had any concerns regarding discrimination, retaliation or hostile work environment she was to immediately report it to Human Resources, the University's internal EOP office and all matters would be handled internally immediately by the University with no repercussions on the employee who reported it or who participated in the actions as a witness.  Based on the training and policies the Plaintiff was aware that she was required to report any discrimination to the EOP office and allow the University to investigate.[25]

5. The Plaintiff was aware of the Defendant, University of South Carolina's policy regarding reporting discrimination based on age and race.[26]  However, the Plaintiff was unaware of any other reporting requirements as required by the law.  The Plaintiff had never been subjected to discrimination, retaliation or hostile work environment.[27]  At no time did Mr. Gist and Ms. Edwards inform the Plaintiff that her claims were Title VII violations and that she was required to report them other than to the EOP office.  Later after many failed attempts with the EOP office to change the environment the Plaintiff conducted her own

---

[23] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*
[24] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*
[25] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*
[26] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*
[27] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*

research and discovered the requirements of Title VII.[28]  Gist boasted on several occasions

to the Plaintiff and his deposition that he had never lost a discrimination case.[29]

6. On October 6, 2014, the Plaintiff filed a formal discrimination complaint with the EOP

    office.[30]   The Plaintiff set forth the Reasons for the Report were "Bullying; Color

    Discrimination-Staff; Hostile Environment-Staff; Racial Discrimination-Staff."[31]   The

    only people the Plaintiff talked to or met with in the EOP office was Ms. Edwards and Mr.

    Gist.[32]

7. On October 24, 2014, the Plaintiff received a Full Time Reassignment from Karen H.

    Roberts, Senior Director, Budget and Human Resources.[33]  The Plaintiff was to remain in

    the position of Program Coordinator 1 at the University of South Carolina.  The Plaintiff

    was to report to the Director of Information Systems in Gift Administration and

    Information Systems.  The Plaintiff started the new Full Time Employment (Reassignment)

    on October 31, 2014.[34]

8. On April 13, 2015, the Plaintiff presented a letter to Karen Roberts, Senior Director Budge

    and Human Resources regarding the treatment she had received.  The letter set forth the

    following:

    "On May 30, 2013, I was hired as a Program Coordinator I, in the Development Office
    as a Gift Processor (see attachment). From the inception I encountered a hostile
    environment where I endured constant verbal abuse, harassment, isolation, disrespect,
    unethical and unprofessional behaviors that made it difficult for me to be successful
    in the duties I was hired to perform. After months of consulting management (who
    witnessed these behaviors daily) to no avail, I contacted Rhonda Y. Edwards,
    Investigator, USC Office of Equal Opportunity Programs and Bobby D. Gist,
    Executive Assistant to the President for Equal Opportunity Programs, and was advised

---

[28] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*
[29] *Exhibit 24 to Plaintiff's Response, page 36.*
[30] *Exhibit 12 to Plaintiff's Response, Plaintiff's formal EOP Incident Intake Form.*
[31] *Id.*
[32] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*
[33] *Exhibit 8 to Plaintiff's Response, Offer of Employment.*
[34] *Exhibit 8 to Plaintiff's Response, Offer of Employment.*

to contact you.  Once we met, I shared the discriminatory practices I was enduring, and the decision was made to remove me from Gift Processing rather than removing the individual(s) who was creating the hostile environment. I was placed in the Development Office in the Info Systems Department as a Program Coordinator I (See Attachment). The duties I have performed for the past six months in the Info Systems Department as a Data Coordinator I, has consisted of me only making changes to and updating names, addresses, email addresses and telephone numbers in the Millennium Database. According to my co-worker, Michael Allen, it was "voted" by "the powers that be" that I would not have many system permissions that are required to perform basic functions. When records require deletions, I must send the request to one of my colleagues because that is one of the permissions I was stripped of when I was relocated to this department. Laura Dipette, a part- time/temporary employee, has more duties, responsibilities and permission accesses than a full time/permanent employee. Everyone in the Info Systems Department, me being excluded, have multiple duties and responsibilities that leads to personal growth and professional development while I am left to perform a single duty that has no growth component what so ever.

When I was placed in Info Systems, it was presented to me as a position that would provide professional growth and development with a variety of duties and responsibilities. From the first week I was able to ascertain that the duties were far beneath my capabilities and did not require strategic thinking or a high level of decision making amongst other things. Nevertheless, I remained hopeful, professional and in good spirits while waiting to be given additional duties and/or instruction. To date, I haven't been assigned any other duties or given further instruction. At this point, I feel that I am being discriminated against by method of retaliation and humiliation. This position is not multifaceted, does not allow me an opportunity to interact with my peers, has led to total isolation in that there are very few questions when updating the data base, I have been humiliated and reduced to performing one mediocre task of updating the Millennium data base without the benefit of having all permissions needed to perform the tasks in which I have been assigned, and this one responsibility does not promote profession growth or development. In the six months I have occupied this position, I have never met with anyone on my management team to discuss, suggest, change or plan for me to be assigned additional duties and/ or responsibilities which has been very disappointing.

"Further evidence of being retaliated against occurred when the position of Prospect Research Assistant was created, but never advertised, and given to a Caucasian temporary employee that was made full time on or about six months ago. Clearly the opportunity was missed for me to be placed in a position that required similar knowledge, skills and abilities as the position from which I was removed.

"The position I currently hold only has one requirement, which is to update the database; I was never given an opportunity to apply for this position.

"It was with great excitement that I accepted the position as a Gift Processor. Never did I imagine that I would have to endure constant scrutiny and criticism to the point that I would be removed from the position that I was hired for but never given the

opportunity to master. And now, I find myself relocated to a demeaning and meaningless position because I addressed the behaviors I was experiencing.
"In closing, I am fully aware, and it is painfully obvious that I will not be given fair and equal opportunity for advancement in this department. It is clearly understood based upon all the incidents that I have experienced and endured, when positions for which I qualify become available, I will continue to be overlooked.
"Respectfully, Avril L. Wilson"[35]

9.  On April 20, 2015, the Plaintiff filed a complaint with the University's Equal Opportunity

    Programs Office regarding the discrimination, hostile work environment and retaliation

    she was subjected to.  The claim was made to Bobby Gist and Rhonda Edwards.[36]

10. On May 6, 2015, the Plaintiff sent a formal letter to Mr. Gist/Ms. Edwards regarding her

    concerns with her claim and the meeting.[37]  The letter set forth the following:

    "After meeting with you and Mr. Gist on April 20th to discuss the discriminatory practices

    I continue to encounter since my relocation from Gift processing to Information systems,

    I wanted to submit additional information to substantiate the basis for my claim…The

    relocation was not per my wishes but the result of my taking issue with being in a hostile

    work environment, having little work duties and responsibilities, not being afforded the

    full opportunity to be educated and exposed to all facets of my position in its entirety,

    enduring constant bullying, isolation and a host of other reasons that went unaddressed by

    management for months…My voicing concerns regarding the treatment that was being

    inflicted upon me daily, it was later decided that I would be relocated, rather than

    management dealing with the individuals who were behaving less than professional thus

    causing me personal and professional harm.  The senior employees that controlled the

    environment were allowed to remain in their respective positions while I now sit in a

---

[35] *Exhibit 13 to Plaintiff's Response, Plaintiff's letter to Karen Roberts.*
[36] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*
[37] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*

demeaning position with limited responsibilities, little to no interaction with my colleagues and no professional development, etc.…During our meeting, Mr. Gist stated that he was hesitant to go forward with a formal complaint because he did not want it to be said that I was the problem…Mr. Gist also mentioned, that in his opinion, the issues I faced in Gift Processing had been satisfied by my relocation.  I'm not certain how it came about that I would be placed in Information Systems but, Loren Thouvenot is the Senior Director of Gift Processing and Information Systems.  The employees in this department suffer with the same mentality as those in Gift Processing.  I reached out to Loren Thouvenot and informed her of the treatment I experienced in Gift Processing on several occasions and she always stated that she was having the same set of issues with Information Systems, and we would be having a meeting to address it; to date, no such meeting has ever been held. Therefore, Information System was less than ideal for a promising relocation."[38]

11. On May 19, 2015, the Plaintiff submitted another formal complaint.  The Plaintiff believed at this time that her only avenue of relief was the EOP office.  The Plaintiff informed Bobby Gist and Rhonda Edwards of the complaint.  As a result of the complaint, the Plaintiff was informed by Gist and Edwards that her complaints would be investigated immediately. They further informed her that she would be given satisfaction because they believed she had been subjected to discrimination and retaliation.[39]

12. On June 2, 2015, the Defendant, Rhonda Edwards sent a letter to the Plaintiff informing her that there was no evidence to support allegations that your supervisors or any of your coworkers, past or present or other USC personnel violated any USC EOP policies.[40]  The

---

[38] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*
[39] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.  Exhibit 13 to Plaintiff's Response, Plaintiff's letter to Edwards May 6, 2015.*
[40] *Exhibit 7 to Plaintiff's Response, Letter.*

Plaintiff was disappointed regarding this letter.  At this time, the Plaintiff was not aware that she could go to the South Carolina Human Affairs or the EEOC.[41]

13. As a result of receiving the letter the plaintiff contacted the EOP office and was led to believe her complaints were still being investigated.[42]

14. The Plaintiff visited the EOP, emailed Gist and Edwards and contacted them by phone on several occasions and each time the plaintiff was led to believe that her claims were still being investigated.

15. On November 5, 2015, the Plaintiff had a Professional Development Meeting with Management Staff.  The Plaintiff requested the meeting due to the lack of training, isolation and limited database permissions and duties.[43]

16.  As a result of the work environment the Plaintiff was required to take disability leave from December 17, 2015 through January 10, 2016.[44]

17. On February 4, 2016, the Plaintiff inquired with Caroline Agardy regarding new opportunities at the University for her.[45]

18. On February 5, 2016, the Plaintiff an update to her position with a pay raise.[46]

19. On February 8, 2016, the Plaintiff received a job description for Program Coordinator 1- Development Office with Gabrielle Barnes.[47]

20. On February 16, 2016, Jamar Mitchell sent the Plaintiff an email regarding collaborating with others within the university attempting to find the Plaintiff a position since June 2015

---

[41] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*
[42] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*
[43] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*
[44] *Exhibit 13 to Plaintiff's Response, January 11, 2016 Letter regarding disability leave.*
[45] *Exhibit 13 to Plaintiff's Response, Plaintiff's email to Carole Agardy February 4, 2016.*
[46] *Exhibit 8 to Plaintiff's Response, Offer of Employment.*
[47] *Exhibit 4 to Plaintiff's Deposition, Defendant's Memorandum.*

to facilitate a relocation.[48]  Mitchell contended it was the Plaintiff fault for not being able to find a position because of her resistance.  However, the Plaintiff never requested to be moved from her position in the very beginning or subjected to the random transfers.[49]

21. On April 15, 2016, the Plaintiff applied for the position of Administrative Assistant-Office Manager in the Office of Organizational and Professional Development.

22. On April 29, 2016, the Plaintiff was assigned to a large project.  As a result of the assignment, the Plaintiff was harassed.

23. On April 29, 2016, the Plaintiff arrived at work and logged into her computer and learned that Laura Martin had resigned.  There were individuals discussing the resignation of Ms. Martin.[50]

24. On May 4, 2016, the Plaintiff was harassed for going over Gabrielle Barnes head to communicate with Loren Thouvenot.[51]  The Plaintiff had gone to Thouvenot about the hostile work environment and harassment.  All persons in the Plaintiff's new department were aware of the complaints filed by the Plaintiff in Gift Processing because USC made no secret of why the Plaintiff was transferred to Info Systems.[52]  As a result of that harassment the Plaintiff again went to Thouvenot and reported the issues with her department.  Thouvenot was also the Director of Gift Processing and she took no actions to address the Plaintiff's serious complaints regarding hostile work environment and retaliation for her complaints.[53]

---

[48] *Exhibit 5 to Plaintiff's Response, Defendant Gist's RFP Responses page 15.*
[49] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*
[50] *Exhibit 4 to Plaintiff's Response, Plaintiff's Time line documents.*
[51] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.  Exhibit 4 to Plaintiff's Response, Plaintiff's Time line documents.*
[52] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*
[53] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*

25. On May 17, 2016 Rhonda Edwards sent the Plaintiff an email regarding the meeting with the Plaintiff and informed the Plaintiff that the EOP office would not opening an investigation into her retaliation complaints. The EOP deemed that a letter of apology to the Plaintiff was enough to satisfy the Plaintiff's complaints.[54]

26. On June 7, 2016, the Plaintiff contacted Jamar Mitchel, Edwards and Gist regarding issues she was having in her department.[55]

27. On June 8, 2016, the Plaintiff set up an appointment with Edwards to discuss the situation.

28. The Plaintiff filed a charge of discrimination on July 12, 2016 with the South Carolina Human Affairs Commission.[56]

29. On June 9, 2016, the Plaintiff thanked Edwards and Gist for meeting with her and listening to her regarding her experiences in the Development Office.[57]

30. On June 16, 2016, the Plaintiff sent an email to Gist and Edwards regarding the discriminatory behavior that was occurring in her current department.[58]   The Email specifically stated the following:

"Pursuant to the conversation I had with you and Mr. Gist today, I am seeking vindication and restitution for the discriminatory acts that I have suffered from my colleagues and management staff starting in 2013 and has continued to date. The discriminatory acts I face(d) have been intentional, mean spirited, consistent, retaliatory and have been directed solely towards me. But for my age and race, these discriminatory acts would not have taken place.  In the numerous emails forwarded to your office by me, the discriminatory acts were outlined in full detail for your review and investigation. Although I have had just as many meetings with you all over the past three years to discuss these discriminatory acts, it has never been determined by your office that the acts described were in violation of Title VII of the Civil Rights Act of 1964.

---

[54] *Exhibit 5 to Plaintiff's Response, Gist RFP page 21.*
[55] *Exhibit 18 to Plaintiff's Response, Mitchell email 6/7/2018.*
[56] *Exhibit 1 to Plaintiff's Response, Charge of Discrimination.*
[57] *Exhibit 18 to Plaintiff's Response, Mitchell email 6/9/2016.*
[58] *Exhibit 18, to Plaintiff's Response, Email from Plaintiff to Edwards and Gist, 6/16/2016.*

"During our communication, I informed you all that I will be filing a Complaint on the basis of Discrimination. I asked if I should attach all emails including the emails I submitted with my first Complaint but, it was said that those emails were historical as they are in the past. It is my opinion that you are correct, the former emails are historical as they prove and show a repeated "history" of the discriminatory behaviors that I have faced and continue to face therefore they have relevancy in this case and should be considered and entered as evidence to support my claims. The discriminatory claim does not rest on the weight of the historical emails alone. There are current emails that support the historical emails which is why my claim of discrimination should be addressed immediately since it has gone unaddressed or investigated for the past three years.

"Mr. Gist has stated that it is his desire to secure me a position outside of Development as a first order of business.  I agree with the relocation as at this point it is a necessity however, I would like to take part in my placement and request a written statement citing the relocation is due to a pending claim of continued discrimination that has taken place from 2013 to date and the claims are currently under investigation.

"Addressing the discriminatory behaviors is my first priority as I have suffered a constant hostile work environment, anxiety, stress, fatigue, sleeplessness, nausea, loss of appetite, depression, upset stomach, fearfulness and continue to suffer from the discriminatory practices my management staff continues to impose upon me. It is imperative that my management staff, who witnessed, allowed and inflicted these discriminatory practices be held to a higher level of accountability and face reprimand for their actions. All managers are required to attend various trainings and are educated on matters such as this however, my management team has made a conscious effort to ignore such trainings and caused further injury by taking part in discriminatory acts towards me. How can I, an employee be expected to follow procedural practices when being led by a management staff who does not lead by example? Of the employment relocation/reassignment options Mr. Gist presented to include: The Medical School, EEO Office, Human Resources and Employee Relations, I would prefer to discuss all opportunities
in great detail prior to relocation.  Please note, I do not accept this relocation as a part of the negotiations for my pending discrimination claims. Rather, I feel this is an appropriate gesture that the University should make on my behalf due to the deplorable circumstances I have/am currently experiencing.

"In closing, I look forward to your follow-up regarding the position reassignment options and a response to my discrimination claims as well.
"Respectfully, Avril **L.** Wilson"[59]

---

[59] *Exhibit 18 to Plaintiff's Response, Mitchell email 6/7/2018.*

31. On June 21, 2016, the Plaintiff was informed by Rhonda Edwards that Bobby was looking at the information she had dropped off and her and Bobby were currently working with employee relations department on a few options and would get back to her.[60]

32. On June 29, 2016, the Plaintiff sent an email to Edwards regarding her concerns and requested that Edwards answer several questions regarding the disparate treatment the Plaintiff had received over the last 3 years.[61]

33. On July 1, 2016, Edwards contacted the Plaintiff and informed her that HR had a meeting regarding her placement and wanted to discuss the good news with the Plaintiff.[62]  The Plaintiff responded to Edwards email on July 5, 2016 requesting a phone call.[63]

34. On July 6, 2016 the Plaintiff an email to Rhonda Edwards regarding her research on Title VII and the issues involved with her case.[64]

35. On July 7, 2016, the Plaintiff was assigned to shadow in Purchasing department.[65]

36. On July 11, 2016, the Plaintiff was transferred from Development to the Purchasing Department within Office of Business Affairs.[66]

37. On July 14, 2016, the Plaintiff submitted another intake form to the EOP office.[67]

38. On July 15, 2016, Bobby Gist sent an email to Caroline Agardy stating the following: "Caroline, thank you, we have worked very hard to address her concerns and I thank you Rhonda and Jamar.  She has visited our EOP AND HR Office SO MANY TIME OVER THE PAST SEVERAL MONTHS, and as stated to her, and Jamar, and Rhonda who totally

---

[60] *Exhibit 18 to Plaintiff's Response, Mitchell email 6/21/2016.*
[61] *Exhibit 18 to Plaintiff's Response, Mitchell email 6/29/2016.*
[62] *Exhibit 18 to Plaintiff's Response, Mitchell email 7/1/2018.*
[63] *Exhibit 18 to Plaintiff's Response, Mitchell email 7/5/2018.*
[64] *Exhibit 19 to Plaintiff's Response, Emails to SCHAC.*
[65] *Exhibit 18 to Plaintiff's Response, Mitchell email 7/8/2018.*
[66] *Exhibit 25 to Plaintiff's Responses, Letter.*
[67] *Exhibit 18 to Plaintiff's Response, Mitchell email 7/14/2018.*

agree with me, she needs to learn how to work with her co-workers, male and female, black and white. And persons of any other Race, and all persons in the workplace. We have reached out to help her so many times, and clearly our Rohr Records show she has never been subjected to any kind of illegal discrimination based upon her race under Title VII or Title VI…Hopefully, she will FINALLY LISTEN and will sign an agreement to accept the position in Purchasing, if not, we will not take nay further action to address her concerns that are totally not actionable."[68]

39. On July 22, 2016 and email was sent that the Plaintiff's transfer to Purchasing was a one-year transfer and at the end of that year she would be sent back to Development.[69]

40. On July 27, 2016 the Plaintiff was working in the Purchasing Department but had not received any paperwork regarding the transfer.[70]

41. On August 2, 2016, the Plaintiff was informed that because she had filed complaints with the SCHAC and the EEOC the President of the University refused to meet with her.[71]

42. On August 8, 2016 the Plaintiff responded to J. Cantey Heath, Jr., Chief of Staff and Special Assistant to the President's email with an email of her own which set forth all of her complaints, the treatment received by the EOP office and the failures of the University.[72]

43. On August 10, 2016, Bobby Gist sent an email to Edwards stating that the President should not meet with the Plaintiff. Mr. Gist email set forth the following: "I totally concur with Terry's recommendation that Dr. Pastides not meet with this employee who we have spend endless hours in our EOP Office, our HR Office and now our Legal Office addressing her

---

[68] Exhibit 5 to Plaintiff's Response, Gist's RTP Responses, page 29.
[69] Exhibit 5 to Plaintiff's Response, Gist's RTP Responses, page 36.
[70] Exhibit 5 to Plaintiff's Response, Gist's RTP Responses, page 40.
[71] Exhibit 5 to Plaintiff's Response, Gist's RTP Responses, page 41.
[72] Exhibit 5 to Plaintiff's Response Gist's RTP Responses, page 43.

non-actionable allegations…our legal office is addressing this and clearly this will be dismissed." Mr. Gist's actions show his level of pride in treating the Plaintiff poorly in emails, letters, and his deposition.

44. Despite the representations of Mr. Gist that the Plaintiff had some inability to get along with others there were no complaints about the Plaintiff and she was fully successful on all of her evaluations with the Defendant.[73] Further all persons the Plaintiff dealt with had exceptional things to say about her ability and her interactions with the customer service she provided.[74] Others rated the Plaintiff's customer service as a 10 out of 10.[75] Stating that the Plaintiff was extremely accommodating.[76] "You were most responsive, helpful and quickest person I've dealt with while inquiring with the Millennium help desk."[77] "I was grateful that she took the initiative to let me know about this time saving approach. She also presented the suggestion in a very positive way, in a tone that assured me of her support for what we are trying to achieve. I think customer service is a lost art or has lost importance in some businesses and organizations. I appreciate the kindness and high level of customer support that Avril has provided me over time. I get the sense that she is smiling as she writes her emails. What a wonderful trait that is!"[78] "Five Star AAAAA+ rating! You are a joy to work with!"[79] "No constructive feedback needed, Avril. You have always provided top-notch, timely help to my team and me."[80] These emails comments from individuals working with the Plaintiff do not support Mr. Gist contentions to the President,

---

[73] Exhibit 9 to Plaintiff's Response, Plaintiff's Evaluations.
[74] Exhibit 15 to Plaintiff's Response, Emails regarding Plaintiff's Assistance.
[75] Exhibit 15 to Plaintiff's Response, Emails Lindsey Griffin's email.
[76] Exhibit 15 to Plaintiff's Response, Emails-Kaydee Arthur's email.
[77] Exhibit 15 to Plaintiff's Response, Emails-Erin Taute's email.
[78] Exhibit 15 to Plaintiff's Response, Emails Beth Hutchison's email.
[79] Exhibit 15 to Plaintiff's Response, Emails Jenny Savilla email.
[80] Exhibit 15 to Plaintiff's Response, Emails, Dena Byerly email.

to Caroline Agardy and others.  The representation does not sound like someone who has an inability to get along with anyone and should just leave her employment.

45. On August 17, 2016, the Plaintiff requested an official status of her transfer documents.[81] The Plaintiff informed Karen Roberts that she had been in the current department for a month with no duties and responsibilities.

46. On October 13, 2016, the Plaintiff updated the SCHAC on her situation and the status of her employment with USC.[82]   The Plaintiff informed the SCHAC that she had been demoted from a Program Coordinator to an Administrative Coordinator which was blatant retaliation.  The Plaintiff requested that the SCHAC take immediate action regarding the retaliation she was suffering.

47. On October 13, 2016, the Plaintiff was informed by the SCHAC that they were ready to submit her case and explained the process with the SCHAC.[83]

48. On October 31, 2016 the Plaintiff received a pay raise and an updated job duties and responsibilities from the University regarding Purchasing Department.[84]

49. On October 31, 2016, the Plaintiff informed the SCHAC that she was at a standstill in her position with USC.  Based on the case she had filed with the SCHAC, there was no other conclusion than to draw that she was a target and being retaliated against.  The Plaintiff further informed SCHAC that the duties that she was currently performing were below what a person of her pay grade and time should be performing.  That her position did not require any analytical or critical thinking.  The Plaintiff further informed SCHAC that she had been hired for a position she enjoyed and not was doing nothing but serving as a

---

[81] *Exhibit 19 to Plaintiff's Response, Emails to SCHAC.*
[82] *Exhibit 19 to Plaintiff's Response, Emails to SCHAC.*
[83] *Exhibit 19 to Plaintiff's Response, Emails to SCHAC.*
[84] *Exhibit 8 to Plaintiff's Response, Offer of Employment.*

receptionist and performing Data Entry.  The Plaintiff was sickened by how she was being treated by USC.  The Plaintiff further informed SCHAC that others were performing meaningful duties, but she was not in retaliation for her complaints.  The Plaintiff asked SCHAC what she should do regarding the acts of retaliation that she was continuing to suffer.  The Plaintiff begged for assistance and wanted to know if anyone was going to do anything about her situation.[85]

50. The Plaintiff had several communications with the SCHAC office to explain what happened during her employment and on 11/2/2016 she stated: Gist's statements to the Plaintiff that Formal Complaints are always reviewed by him.  The Plaintiff further informed the SCHAC that Ms. Edwards informed the Plaintiff that she [Edwards] was instructed not to investigate the Plaintiff claims and to ignore her complaints.  The Plaintiff was also informed by Edwards that her complaints were never accepted as a Formal Complaint.  The Plaintiff was never informed that the violations and complaints she was reporting were Title VII violations.

51. That in December of 2016 the Plaintiff was denied the opportunity to attend Purchasing Card Training in her department.  Many other individuals in her department were provided the training.[86]  Other individuals were permitted to become Buyers in the Purchasing department.  However, the Plaintiff was not.[87]

52. The Plaintiff filed a second charge of discrimination in December 2016.

---

[85] *Exhibit 19 to Plaintiff's Response, Emails to SCHAC.*
[86] *Exhibit 10 to Plaintiff's Response, Sign in Sheet.*
[87] *Exhibit 10 to Plaintiff's Response, List of Buyers.*

53. That the Plaintiff has continued to be employed with the University. That the Plaintiff has exhausted all of her leave and been required to take unpaid leave due to the treatment suffered at the hands of the Defendants.[88]

54. The Plaintiff has bee reassigned to the Office of Development and has observed that the Development office is completely different there are at least 8 additional people of color employed in the Department.[89]

55. In Mr. Gist's letter to the SCHAC office he states that the Plaintiff's complaints were thoroughly reviewed. However, the complaints made by the Plaintiff were not investigated and as stated in Edwards own letter an investigation was never opened into the retaliation complaints. At all times it was an irrational level of Pride with Mr. Gist even in his deposition regarding his record with the university. Ultimately leading one to believe that his record was more important than the actual people that worked at the university.[90]

56. No investigation was conducted into the complaint made by the Plaintiff to USC.[91]

## V.    LEGAL ANALYSIS

The Defendants are not entitled to Summary Judgment on the Plaintiff's causes of actions pursuant to South Carolina or Federal Law. The fact is that Summary Judgment should not be granted when motive and intent are at issue.[92]

**A. The Plaintiff has Presented a Valid Cause of Action for Breach of Contract and Breach of Contract Fraudulent Intent Against USC, Gist and Edwards.**

---

[88] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*
[89] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*
[90] *Exhibit 5, page 48-49. Exhibit 24 to Plaintiff's Response, Gist's Deposition. Exhibit 22, Edwards Deposition page 31.*
[91] *Exhibit 22, Edwards Deposition, page 19, 20, 24, 40, 43.*
[92] *Ballinger v. North Carolina Agric. Extension, Serv., 815 F. 2d 1001, 1005 (4th Cir. 1987).*

The Defendant only relies on the Plaintiff's complaint for support of her complaint regarding Breach of Contract and Breach of Contract Fraudulent Intent. The Defendants contend that the Plaintiff was not a contract employee and therefore could not possibly have a cause of action for Breach of Contract or Breach of Contract with Fraudulent Intent. However, the Plaintiff's causes of action are based not on a contract but on the policies and procedures issued by USC and the promises issued by Gist and Edwards which the Plaintiff had a right to rely on as an employee.

The Defendants attempt to argue that the Plaintiff is not entitled to any cause of action against Gist and Edwards because they did not employ the Plaintiff. However, the Defendant fails to consider the fact that Gist and Edwards made representations to the Plaintiff and mislead her to harm her. Gist went out of his way to mislead the Plaintiff to protect his record of "never losing a case."[93]

In order to have a Breach of Contract with Fraudulent Intent it is essential that there be a breach of the contract, fraudulent intent relating to the breach and a fraudulent act accompanying the breach. Harper v. Ethridge, 209 S.C. 112, 348 S.E. 2d 374 ,378 (1986). The elements to the claim for breach of contract accompanied by a fraudulent act, a party must show: (1) a breach of contract; (2) fraudulent intent relating to the breaching of the contract and not merely to its making; and (3) a fraudulent act accompanying the breach. Fraudulent act" is broadly defined as any act characterized by dishonesty in fact or unfair dealing. "Fraud," in this sense, assumes so many hues and forms, that courts are compelled to content themselves with comparatively few general rules for its discovery and defeat, and allow the facts and circumstances peculiar to each case to bear heavily upon the conscience and judgment of the court or jury in determining its presence or

---

[93] *Exhibit 24, to Plaintiff's Response, Gist Deposition.*

absence. Breach of contract accompanied by a fraudulent act requires proof of fraudulent intent relating to the breaching of the contract and not merely to its making, and such proof may or may not involve false representations. Fraudulent intent is normally proved by circumstances surrounding the breach. The fraudulent act may be prior to, contemporaneous with, or subsequent to the breach of contract, but it must be connected with the breach itself and cannot be too remote in either time or character.  "Fraudulent intent is normally proved by circumstances surrounding the breach."[94] "The fraudulent act may be prior to, contemporaneous with, or subsequent to the breach of contract, but it must be connected with the breach itself and cannot be too remote in either time or character." Id. at 54, 336 S.E.2d at 504."Breach of contract accompanied by a fraudulent act . . . requires proof of fraudulent intent relating to the breaching of the contract and not merely to its making. Such proof may or may not involve false representations."[95] "Fraudulent intent is normally proved by circumstances surrounding the breach." *Floyd*, 287 S.C. at 54, 336 S.E.2d at 503-04. "The fraudulent act may be prior to, contemporaneous with, or subsequent to the breach of contract, but it must be connected with the breach itself and cannot be too remote in either time or character."[96]   Nevertheless, "although the cases involving breach of contract accompanied by a fraudulent act do not present an easy formula for defining a 'fraudulent act,' it is clear that the fraudulent act alleged must be an act done with the intent to deceive." Save Charleston Found. v. Murray, 286 S.C. 170, 333 S.E.2d 60, 66 (S.C. Ct. App. 1985). Therefore, evidence of fraud, of course, remains essential, and "the courts occasionally have sustained

---

[94] *Floyd v. Country Squire Mobile Homes, Inc., 287 S.C. 51, 54, 336 S.E.2d 502, 503-04 (Ct. App. 1985).*
[95] *Ball v. Canadian Am. Express Co., 314 S.C. 272, 276, 442 S.E.2d 620, 623 (Ct. App. 1994) (citation omitted).*
[96] *Zinn v. CFI Sales & Mktg., 415 S.C. 93, 780 S.E.2d 611, 2015 S.C. App. LEXIS 244, 25 Wage & Hour Cas. 2d (BNA) 1447. (quoting Sullivan v. Calhoun, 117 S.C. 137, 139, 108 S.E. 189, 189 (1921)).*

demurrers to complaints attempting to state a claim for breach of contract accompanied by a fraudulent act where plaintiffs have failed to allege fraudulent intent or a fraudulent act."[97]

The Plaintiff was made extensive assurances that her claims would be investigated, and she would receive satisfaction regarding those complaints.  However, after filing this action the Plaintiff learned that the Defendants, USC, Gist and Edwards failed and refused to investigate the Plaintiff's complaints.[98]  Gist intentionally mislead the Plaintiff in order to delay her filing with the EEOC and the SCHAC in order to protect his record with the University.[99]  The fraud was in the act of delaying the process and misleading the Plaintiff with representations that they were still investigating her complaint and that the process through the EOP was the Plaintiff's only option.[100]  In accordance with the Case law the act of fraud has to be separate and apart from the contract or in this case the agreement made by Gist, Edwards as representatives of USC and the Plaintiff.  The question at summary judgment is whether or not there is a genuine issue of material fact for a jury to consider.  When viewing the facts in a light most favorable to the Plaintiff is there an issue for a jury to consider.  The facts support an issue for the Jury.  The Defendant relies on the letter of June 2, 2015.  However, despite that letter the Defendants had further contact with the Plaintiff, the Plaintiff filed continual complaints regarding retaliation, the Defendant refused to investigate or even open a formal complaint despite the many filings of the Plaintiff.  The Defendants led the Plaintiff to believe that despite the letter her claims were still being investigated.

The elements of Breach of Contract are present.  The Plaintiff and the Defendants, Gist and Edwards entered into an agreement.  Gist represented to the Plaintiff that her claims would be

---

[97] Edens v. Goodyear Tire & Rubber Co., 858 F.2d 198, 201 (4th Cir. 1988).
[98] Exhibit 5, page 48-49.  Exhibit 24 to Plaintiff's Response, Gist's Deposition.  Exhibit 22, Edwards Deposition page 31.
[99] Exhibit 24, to Plaintiff's Response, Gist Deposition, Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.
[100] Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.

investigated, and she would receive satisfaction. However, based on testimony and representations presented Gist never investigated the Plaintiff's claims and committed fraud when he misled her after the June 2015 letter up and until July 2016.[101] The Defendants breached that contract when they failed to investigate the Plaintiff's complaints as represented by Ms. Edwards in her deposition testimony.[102] The Plaintiff suffered significant harm as result of the Breach. The Defendants delayed the process and the Plaintiff filed with the EEOC outside the original time frame of 300 days for the discrimination that occurred in the Gift Processing department. Ultimately when examining this claim the Court must look at the Plaintiff's original complaint which was filed in October 2014. The Defendant did not issue the letter until June of 2015 well past the time frame to file with the SCHAC of 180 or the EEOC of 300 days which substantially harms the Plaintiff. It also upholds Gist's record of a spotless reputation of never losing a case and his contentions that this case will be dismissed.[103]

The Plaintiff has met all elements of the cause of action and the Breach of Contract Claims should be presented to a jury as a genuine issue of material facts exists for a jury to consider.

**B. The Plaintiff has Presented a Valid Cause of Action for Negligent Supervision of an Employee against University of South Carolina.**

Under normal circumstances, the Court finds that companies usually don't incur liability when they fail to take steps to protect others.[104] However, in certain circumstances the Court has

---

[101] *Supra, Facts as presented.*
[102] *Exhibit 22, Edwards Deposition.*
[103] *Supra, Facts.*
[104] *Many courts have recognized that a plaintiff must demonstrate some propensity, proclivity, or course of conduct sufficient to put the employer on notice of the possible danger to third parties. See e.g., Frye v. Am. Painting Co., 642 N.E.2d 995, 999 (Ind. Ct. App. 1994) (holding that an employer may be held negligent if it retains an employee it knew or should have known had a propensity for dangerous behavior); Alpharetta First United Methodist Church v. Stewart, 221 Ga. App. 748, 472 S.E.2d 532, 536 (Ga. Ct. App. 1996) (holding that an employer may not be held liable for [\*207] negligent hiring or retention unless the plaintiff shows the employer knew or should have known of the [\*\*\*11] employee's dangerous propensities); Gomez v. City of New York, 304 A.D.2d 374, 758 N.Y.S.2d 298, 299 (N.Y. App. Div. 2003) ("Recovery on a negligent hiring and retention theory requires a showing that the employer*

found that parties have found that there is liability. In *Charleston v. Young Clement* the Court followed *Degenhart*[105] which found that an employer may be liable for negligent supervision if the employee intentionally harms another when the employee: (1) is upon the premises of the employer, [**723] or is using a chattel of the employer, (2) the employer knows or has reason to know that he has the ability to control his employee, and (3) the employer knows or should know of the necessity and opportunity for exercising such control. *Id.* at 115-17, 420 S.E.2d at 496; *see also* Restatement (Second) of Torts § 317(1965) (outlining the same elements for negligent supervision).[106]

The issue is whether an employee harmed the Plaintiff and how they harmed the Plaintiff. The Plaintiff was harmed by Gist and Edwards when they failed and refused to properly investigate any of the Plaintiff's claims of retaliation and hostile work environment. The Plaintiff made no secret of the Defendants, Gist and Edward's actions towards her and their failures in their positions, including but not limited requests to meet with the President of the University,[107] Letter to Karen Roberts dated 4/13/2015,[108] and Letter to Parham (Counsel for USC).[109] The Employer was aware that Mr. Gist had the ability to harm the Plaintiff through the delay of the process and the refusal to investigate the Plaintiff's claims. However, the employer failed and refused to address the issues. Substantially harming the Plaintiff further by failing to address her concerns with Gist and

---

was on notice of the relevant tortious propensities of the wrongdoing employee.").

[105] *An employer may have a legal duty to use due care in supervising an employee as a result of a contractual relationship with the employee. This duty sounds in tort, not in contract. This ensuing duty is limited to the employee's actions undertaken in his capacity as an agent for the employer. Degenhart v. Knights of Columbus, 309 S.C. 114, 116, 420 S.E.2d 495, 496 (1992). Degenhart, 309 S.C. at 117, 420 S.E.2d at 496-497; see also Rickborn v. Liberty Life Ins. Co., 321 S.C. 291, 302, 468 S.E.2d 292, 299 (1996).*

[106] *Charleston v. Young Clement Rivers & Tisdale, LLP, 359 S.C. 635, 598 S.E.2d 717, 2004 S.C. App. LEXIS 197.*

[107] *Exhibit 5 to Plaintiff's Response, Heath Email, Exhibit 16 to Plaintiff's Response, Letter to Heath*

[108] *Exhibit 15 to Plaintiff's Response, Letter to Roberts.*

[109] *Exhibit 16 to Plaintiff's Response, Letters to Heath, Parham, Grube.*

the EOP office by refusing to meet with her and address the harm caused by the Defendant, USC failing to exercise the proper control over Mr. Gist.

The Plaintiff has presented a genuine issue of material fact regarding the Defendant USC's failure to properly exercise control over Gist in his position with the EOP office.  Gist obviously took his power seriously and utilized it to the extreme, instructing the Edwards and Mitchell not to investigate and informing the Plaintiff that if she did not like it she could leave the university. Mr. Gist took his power to further extremes by attacking the Plaintiff and stating in his letters to others that the Plaintiff had an inability to get along with others when there is absolutely no evidence of that in the record.[110]  Ms. Wilson had fully successful evaluations with no mention of any inability to get along with others and received stellar reviews from customers regarding her customer service skills.[111]  Mr. Gist further perpetrated the hostile work environment against the Plaintiff by attacking her personally and blaming her for the retaliation and hostile work environment when there was no evidence to support his contentions.

The Defendant is not entitled to summary judgment on the Plaintiff's negligent supervision claims against USC as the Defendant failed to properly supervise its employees, Gist and Edwards when they were aware of their failures.  The Plaintiff has presented a genuine issue of material fact and the Defendant, USC has failed to present that they are entitled to judgement as a matter of law.

**C. The Plaintiff has Presented a Valid Cause of Action for Intentional Infliction of Emotional Distress Against all Defendants.**

Intentional Infliction of Emotional Distress is the Tort of Outrage.[112]  The tort has specific legal requirements, but it also has very subjective elements that are required to be interpreted by

---

[110] *Exhibit 5 to Plaintiff's Response Gist's RTP Responses, page 43.*

[111] *Supra, Facts.*

[112] South Carolina has long recognized "that 'one's willful, malicious conduct proximately causing another's emotional distress may be actionable' as intentional infliction of emotional distress or the tort of outrage." *Williams*

the Court.  In *AJG v. Dunn*, the Court followed *Hansson* and determined that it the burden is on the party plaintiff to establish a prima facie case as to each element of the claim of IIED in order to survive summary judgment. *Hansson v. Scalise Builders of S.C.*, 374 S.C. 352, 358, 650 S.E.2d 68, 71 (2007).[113] To establish such a claim, the plaintiff must show the defendant: (1) "intentionally or recklessly inflicted severe emotional distress, or was certain, or substantially certain, that such distress would result from his conduct"; (2) that the conduct was so outrageous it exceeded "all possible bounds of decency" and so "atrocious" it was "utterly intolerable in a civilized community"; (3) such actions actually caused plaintiff's emotional distress; and (4) the emotional distress was so severe "no reasonable man could be expected to endure it." 374 S.C. at 356, 650 S.E.2d at 70 (citing *Ford v. Hutson*, 276 S.C. 157, 276 S.E.2d 776 (1981)).[114]

The Plaintiff's Intentional Infliction of Emotional Distress Claims are only related to Gist and Edwards.  The Plaintiff has presented a genuine issue of material fact as to whether the Defendants, Gist and Edwards behavior was outrageous.  When looking at the facts in the light most favorable to the Plaintiff it clearly shows that Gist treated the Plaintiff disrespectfully, recklessly inflicted sever emotional distress with no bounds of decency.   Gist behavior towards the Plaintiff was above and beyond that which is permitted in normal society as an investigator of discrimination, hostile work environment and retaliation.  Mr. Gist brags about his prowess in

---

*v. Lancaster Sch. Dist.*, 369 S.C. 293, 305, 631 S.E.2d 286, 293 (Ct. App. 2006) (quoting Ford v. Hutson, 276 S.C. 157, 161, 276 S.E.2d 776, 778 (1981)).

[113] *AJG Holdings v. Levon Dunn,* 391S.S. 463, 463, 706 S.E.2nd 23 (S.C.App.2011).

[114] *AJG Holdings v. Levon Dunn,* 391S.S. 463, 463, 706 S.E.2nd 23 (S.C.App.2011). In order to recover for intentional infliction of emotional distress, a plaintiff must establish the following:

(1) the defendant intentionally or recklessly inflicted severe emotional distress, or was certain, or substantially certain, that such distress would result from his conduct;

(2) the conduct was so " extreme and outrageous" so as to exceed " all possible bounds of decency" and must be regarded as " atrocious, and utterly intolerable in a civilized community; "

(3) the actions of the defendant caused plaintiff's emotional distress; and

(4) The emotional distress suffered by the plaintiff was "severe" such that "no reasonable man could be expected to endure it."  *Hansson v. Scalise Builders of S.C.,* 374 S.C. 352, 356, 650 S.E.2d 68, 70 (2007).

society as an investigator and his record with the University and fails to even consider the Plaintiff and her feelings.  The fact remains that no reasonable person should have been expected to endure Mr. Gist's actions.

As set forth in *Hansson*, "Emotional distress includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is only where it is extreme that the liability arises."[115]  In *Doe v. Rojas,* the Court determined that if "conduct is shown which may be reasonable regarded as extreme and outrageous," the matter should be submitted to the jury to determine "whether the conduct complaint of is, in fact, sufficiently extreme and outrageous to result in liability."[116]  The actions of Gist were outrageous and harmed the Plaintiff.  The Plaintiff is entitled to have her claims for Intentional Infliction of Emotional Distress against Gist presented to a Jury.  The Defendant is not entitled to summary judgment on the Plaintiff's claims for IIED.

**D.  The Plaintiff has Presented a Valid Cause of Action for Race Discrimination in Violation of Title VII Against the University of South Carolina.**

**a.  The Plaintiff Exhausted her Administrative Remedies.**

Prior to filing a suit under Title VII, a plaintiff must exhaust her administrative remedies by filing a charge with the EEOC. *See Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000). The EEOC charge defines the scope of the plaintiff's right to institute a civil suit. *Id*. "An administrative charge of discrimination does not strictly limit a Title VII suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Chisholm v.*

---

[115] Hansson v. Scalise Builders of S.C., 374 S.C. 352, 356, 650 S.E.2d 68, 70 (2007).
[116] *Doe v. Rojas, 2007 S.C. App.*  (siting Fleming v. Rose, 338 S.C. 524, 537, 526 S.E.2d 732, 739 (Ct. App. 2000), rev'd on other grounds,  [*7] 350 S.C. 488, 567 S.E.2d 857 (2002).

*United States Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981). An administrative charge of discrimination does not strictly limit a Title VII suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination. *Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124, 132 (4th Cir. 2002).

The Plaintiff constantly supplemented her charge of discrimination with the SCHAC and EEOC further elaborating on her causes of action and substantiating the claims for Hostile Work Environment and Retaliation.[117]

The Defendant makes an elaborate argument regarding box checking.  However, there is no presentation of evidence that the Plaintiff failed to check any boxes in either of her charges.

The Plaintiff initial claims for Race discrimination were not filed within the 300-day time frame.  However, the actions of the Defendant in hostile work environment based on age and race and retaliation were continuous.  The Plaintiff's continuous claim is retaliation and hostile work environment covered by both charges of discrimination.

The Plaintiff's claims were not vague.  The Plaintiff presented specifics in each of her claims to the Defendants, Gist and Edwards.  The Plaintiff's formal complaints as presented set forth how she was treated differently based on Race.  Substantially as set forth by the Defendant's own exhibit the individuals employed were all Caucasian.[118]  The fact remains that the Court has determined that charges filed outside the time frame are relevant for background evidence for valid claims.[119]  Ultimately the intention of a charge of discrimination is to put a defendant on notice.  At all times during this process the Defendant was aware of the Plaintiff's claims as the Plaintiff

---

[117] Exhibit 19 to Plaintiff's Response, Emails to SCHAC.
[118] *Exhibit 6 to Plaintiff's Response, Edwards RTP Responses.*
[119] *Evans v. Technologies Applications & Serv. Co.,* 80 F.ed 954, 962 (4th Cir. 1996)(*citing United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558(1977)).

filed the complaint internally and was continuously waiting for the Defendants to complete the investigation.

### b. The Plaintiff was subjected to Race Discrimination.

The Plaintiff has two methods by which to present evidence of discrimination based on race, hostile work environment and retaliation. The Plaintiff can present proof direct/indirect method or the *McDonnell Douglas.*

Pursuant to the law the Plaintiff can present evidence in two ways either direct or circumstantial to substantiate his claims in violation of 42 U.S.C. 2000. Ms. Wilson can present evidence of direct discrimination which includes commentary, but direct evidence is extremely rare in today's educated society.[120] In Ms. Wilson's case there is no direct evidence of discrimination only circumstantial. Therefore, the Plaintiff's must present the evidence pursuant to the shifting burden test of *McDonnell Douglas.*

The Court has continuously throughout the years confirmed and applied the *McDonnell Douglas Corp. v. Green* shifting burden test as the proper way to examine circumstantial evidence cases when race discrimination is involved.[121] In establishing Ms. Wilson's case of race discrimination in violation of Title VII, the Plaintiff must first present a prima facie case of discrimination.[122]

---

[120] *United States Postal Serv. Bd of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482 (1983)

[121] 411 U.S. 792(1973).

[122] "Discriminatory intent may be inferred from the totality of the circumstances, including . . . the historical background of the decision ...; the specific sequence of events leading up to the challenged decision…; [and] contemporary statements by members of the decision making body . . . ." *LeBlanc,* 67 F.3d at 425 (citations and internal quotation marks omitted). The district court correctly decided that the plaintiffs introduced sufficient evidence from which a reasonable juror could conclude that the plaintiffs made out a prima facie case. Their initial burden of production under the McDonnell Douglas analysis is "minimal." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 (1993); *McGuinness v. Lincoln Hall,* 263 F.3d 49, 53 (2d Cir. 2001). City officials and Planning Board members made numerous statements from which a reasonable juror could infer that they denied RECAP's permit application because of the identity of its clients. *Regional Econ Program v. City of Middletown*, 281 F.3d 333, 348 (2nd Cir. 2002).

To establish a prima facie case of discrimination under Title VII, the Plaintiff must show (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; (3) that at the time of the adverse employment action she was performing at a level that met her employer's legitimate job expectations; and (4) similarly situated employees maintained their employment under similar circumstances.[123]  Once Ms. Wilson establishes the prima facie case the burden of proof shifts to the Defendant to show that there is an articulated non-discriminatory reason for the adverse employment action.  (*Id.*)  After the articulated non-discriminatory reason is voiced, the burden is shifted back to Ms. Wilson and then she is given an opportunity to demonstrate by competent evidence that the presumptively valid reasons for the Defendant's treatment of her were illegitimate.  While considering the shifting burden test the Court must remember that *McDonnell Douglas* is not rigid but flexible to accommodate different factual situations.[124]  As recent as 2002, the Supreme Court has set forth "The method suggested in McDonnell Douglas for pursuing this inquiry, however, was never intended to be rigid, mechanized, or ritualistic.  Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination."[125]  The Plaintiff has clearly met all elements of employment discrimination based on race.  When reviewing the

---

[123] Title VII deems unlawful an employer's decision to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.] 42 U.S.C.A. § 2000e-2(a)(1) (West 1994). The Supreme Court first recognized a cause of action for a discriminatory work environment under Title VII when addressing a case of sexual harassment, noting that for such behavior to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of (the victim's) employment and create an abusive working environment.' Meritor Savings *Bank v. Vinson*, 477 U.S. 57, 67 (1986) (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)). Because the same principles that govern sexual harassment also govern claims of racial harassment, see Risinger, 883 F.2d at 479, the United States Supreme Court's decision in *Harris v. Forklift Sys.*, 510 U.S. 17 (1993), the Michigan Supreme Court's decision in *Radtke v. Everett*, 501 N.W.2d 155 (Mich. 1993), and our recent decision in *Williams v. General Motors Corp.*, 187 F.3d 553 (6th Cir. Aug. 5, 1999), govern here.
[124] *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 358 97 S.Ct. 1843, 53 L.ED. 2d 396 (1977).
*Stone v. Autolive ASP, Inc.* 210 F.3d 1132, 1139 (10th Cir. 2000)  *See Also Furnco Constr. Corp v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2843, 57 L.Ed.2d 957 (1978).
[125] *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 506 (2002).

Plaintiff's employment as a whole not just the few acts as presented by the Defendant the Plaintiff has suffered differential treatment in her employment. First and foremost, there was not only one transfer.

The time line of the plaintiff's employment is essential to the Plaintiff's claims:

a.  The plaintiff was hired in May of 2013 Gift Processing;

b.  On October 24, 2014 the Plaintiff met with Karen Roberts and Loren Thovenot and *was informed that she would be relocated*;

c.  On October 27, 2014, the Plaintiff informed Rhoda Edwards that she was not happy with the position because it was not like her Gift Processing position as it had no financial components. The Plaintiff's hope was that she could grow and develop in the position and she was grateful for the opportunity.

d.  October 31, 2014 The Plaintiff is transferred to Information Systems in Gift Administration and Information Systems (Still be supervised by the department she made the formal complaint about)[126];

e.  The Plaintiff was excited about the transfer up and until she was retaliated against, subjected to further discriminatory practices and suffered retaliation;[127]

f.  April 13, 2015 informs Karen Roberts that from the start she has suffered from a hostile work environment in the position she was moved into. The Plaintiff informs her of the significant issues in the department

g.  As set forth by the Plaintiff:

> I reported the incidents to the Director of Gift Processing, Loren Thouvenot-Murphy. She informed me that she also had problems with the employees in her other department, Information Systems.
> Pursuant to policies and procedures I reported my co-workers and management

---

[126] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*
[127] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*

to the EOP office.

As a result of my complaints, I was unwilling transferred and continued to ask why was I the one being removed from my position?  I was in the job I specifically identified, applied, left South Carolina State University for, was performing my duties and was transferred because I followed the university policies and procedures and voiced my complaints regarding discrimination and retaliation which university policies and procedures states would not happen to the complainant.  I did not ask to be transferred. Mr. Gist and Ms. Edwards constantly informed that the transfer was the best option and to accept it and I did so reluctantly but was attempting to be cooperative out of fear of being labeled.  I wanted the opportunity to perform the job I was hired to perform. Due to the discriminatory actions of my colleagues I was the one targeted and transferred.  None of the accusers were disciplined or removed from their positions although they had a history of treating people of color in an unlawful manner.  The University's EOP office (Mr. Gist) was aware of other complaints of discrimination within the Development office which is why he and Ms. Edwards should have investigated my claims and taken them more seriously. Ms. Edwards confided in Karen Roberts, Senior Director, Budge and Human Resources for Development and Alumni Relations and me that she felt horrible because she could see the toll these unlawful acts were taking on me and upset that Mr. Gist would not allow her to investigate my claims.  She said that she knew they did not handle my complaint properly. During deposition, she stated she had no idea who investigated or was assigned to investigate my claims although she and Mr. Gist were the only two people I ever talked to or met with in the EOP office.

h.  April 20, 2015 the Plaintiff has a formal meeting with Gist and Edwards informing them of the hostile work environment and retaliation;

i.  May 6, 2015 the Plaintiff submits a letter to the EOP office;

j.  May 19, 2015 the Plaintiff submits her formal complaint; The Plaintiff was informed that the university would immediately investigate her complaints by Gist and Edwards;

k.  June 2, 2015 The Defendant issues a formal letter regarding the Plaintiff's May 19, 2015 complaints.  This is the first formal response no letter was received regarding the 2014 complaint filed by the Plaintiff.  The Plaintiff was led to believe that those complaints were still being investigated.

l.  November 5, 2015, the Plaintiff requests a Professional Development meeting with management because *she is not receiving training, she is isolated and has limited data base permissions and duties*.

m.  December 2015 to January 2016 the Plaintiff is out of work on disability leave due to the harassment, hostile work environment, failure to train and isolation she is suffering in the work environment. The actions are directly related to her complaints regarding Gift Processing as she is still supervised by the same director she had previously made a complaint about.

n.  Nothing changes until April of 2016, she received a project and is harassed by her co-workers regarding the project;

o.  May 4, 2016 the Plaintiff makes another complaint *regarding harassment, work environment, failure to provide training, mediocre assignments and not duties such as her colleagues*.

p.  7/12/2016 files her first charge of discrimination against USC for Race, Retaliation and Age Discrimination;

q.  As a result, the Plaintiff was transferred to Purchasing; she was provided an Administrative Assistant job description. The Plaintiff refused to sign the job description, so the Defendant changed the title but kept the same duties. The Plaintiff was *demoted in duties and responsibilities but not title*.

The Plaintiff was treated differently than other Caucasian employees. The Plaintiff witnessed employees receiving more favorable treatment on a daily basis. None of the employees were assigned to a dirty file room to only scan documents, required to sit in Roberts office for a week with nothing to do, resigned arbitrarily as result of complaints, failed to receive training and

resources to perform the essential functions of a position, forced to shift from office to office to accommodate others.[128] All actions taken against the Plaintiff were because of her race or because of her complaints.

The Defendant is not entitled to summary judgment on the Plaintiff' Race Discrimination complaint. The Plaintiff has presented evidence of differential treatment based on her race. The Court has the power to look at the actions of the Defendant beyond the 300-day time frame as evidence of discrimination and when looking during the 300-day time frames in both charges of discrimination it is obvious the Plaintiff was subjected to discrimination and differential treatment based on her race. Other individuals who were Caucasian were not subjected to the same treatment as the Plaintiff. Specifically, as presented during the deposition of Ms. Manigo in Purchasing others were treated more favorably than the Plaintiff with training. Further be information systems or Purchasing other individuals as presented in the Facts were provided better resources, better offices, better training and better positions.[129]

The only requirement pursuant to Rule 56 is that the Plaintiff present a fact scenario where there is genuine issue of material fact regarding the treatment received by the Plaintiff and whether that treatment was based on her race. As presented by the Defendant it is obvious that the work environment the Plaintiff was subjected to was not a result of personality conflicts or snubbing. Because despite Mr. Gist's representations that it was just the Plaintiff not being able to get along with her co-workers the Plaintiff received exemplary reviews from customers while she was on the Help desk during 2015 and 2016, and further received a successful review from Loren Thouvenot clearly presenting issue for a jury.

---

[128] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit.*
[129] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit. Exhibit 21 Manigo Deposition, Exhibit 22 Cudd Deposition.*

The Plaintiff requests that her claims for Race Discrimination in violation of Title VII be presented to a jury and the Defendant, USC motion for Summary Judgment be denied.

**E. The Plaintiff has Presented a Valid Cause of Action for Retaliation in Violation of Title VII Against the University of South Carolina.**

Title VII requires employers to provide equal treatment for all persons in the workplace, regardless of race, color religion, sex, national origin, protected disability, or age. 42 U.S.C. Section 2000(b).[130] Title VII also prohibits an employer from retaliating against an employee for reporting discrimination based on any of the above listed reasons. *Id.* Retaliation is an unlawful discriminatory act of the employer taken against any employee for doing any one of the following: 1) opposing an unlawful employment practice or 2) participating, charging, testifying or assisting in an investigation, proceeding or hearing. *Id.*[131]

Retaliation is an unlawful discriminatory act of the employer taken against any employee for doing any one of the following: 1) opposing an unlawful employment practice or 2) participating, charging, testifying or assisting in an investigation, proceeding, or hearing.[132] Protected activity can take two forms opposition and participation. Opposition is when an employee opposes any practice made unlawful by Title VII and ADEA from retaliation.[133] The

---

[130] *42 U.S.C. 2000(e)*
*Title VII's anti-retaliation provision provides:*
*(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. 2 U.S.C. § 2000e-3(a) (section 704(a) of Title VII) (emphasis added).*
[131] *Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on "race, color, religion, sex, or national origin," 42 U. S. C. §2000e-2(a), and its anti-retaliation provision forbids "discriminat[ion] against" an employee or job applicant who, inter alia, has "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation, §2000e-3(a). Respondent White, the only woman in her department, operated the forklift at the Tennessee Yard of petitioner Burlington Northern & Santa Fe Railway Co. (Burlington). Burlington N. & S.F.R. Co. v. White, No. 05-259 (2006)*
[132] *42 U.S.C. Section 2203(a).*
[133] *EEOC v. Navy Federal Credit Union, 424 F.3d 397, 406-407 (4th Cir. 2005)*

Opposition refers to an employee who opposes a practice that is unlawful or opposes a practice the employee reasonably believes to be unlawful.[134]  The Opposition can include individuals who have spoken out against unlawful practices that do not involve themselves.[135]  In *Anderson vs. GDC, Inc.* the Plaintiff only protested the actions of her supervisor.[136]  The Court determined that was enough to be an opposition complaint and allowed her retaliation claim to go to a jury.

The participation Clause is where the Plaintiff participates by making a charge, testifying, assisting or participating in any manner in an investigation, proceeding or hearing.[137]  The participation clause is much broader than the opposition clause.  Retaliation must be viewed broadly.  "If the facts Thompson alleges are true, his firing by NAS constituted unlawful retaliation. Title VII's anti-retaliation provision must be construed to cover a broad range of employer conduct.[138]  It prohibits any employer action that "'well might have "dissuaded a reasonable worker from making or supporting a [discrimination] charge, " '" *id.,* at 68, 126 S.Ct. 2405.  That test must be applied in an objective fashion, to "avoi[d] the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings."[139]  A reasonable worker obviously might be dissuaded from engaging in protected

---

[134] *Id.*

[135] *Crawford v. Metropolitan Government of Nashville,* ___ U.S. ___, 129 S.Ct. 846, 172 L.Ed2d 650(2009) *""Oppose" goes beyond "active, consistent" behavior in ordinary discourse, where we would naturally use the word to speak of someone who has taken no action at all to advance a position beyond disclosing it.  Countless people were known to "oppose" slavery before Emancipation or are said to "oppose" capital punishment today, without writing public letters, taking to the streets, or resisting the government.  And we would call it "opposition" if an employee took a stand against an employer's discriminatory practices not by "instigating" action, but by standing pat, say, by refusing to follow a supervisor's order to fire a junior worker for discriminatory reasons.  Cf. McDonnell, supra, at 262 (finding employee covered by Title VII of the Civil Rights Act of 1964 where his employer retaliated against him for failing to prevent his subordinate from filing an EEOC charge).  There is, then, no reason to doubt that a person can "oppose" by responding to someone else's question just as surely as by provoking the discussion, and nothing in the statute requires a freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the same words when her boss asks a question."*

[136] *281 F.3d 452, 458 (4th Cir. 2002)*

[137] *42 U.S.C. Section 2000e-3.*

[138] *Burlington N. & S. F. R. Co. v. White, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345.*

[139] *Id.,at 68-69, 126 S.Ct. 2405.*

activity if she knew that her fiancé would be fired. Pp. 867 -869."[140]  Title VII's anti-retaliation provision prohibits any employer action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.,* at 68, 126 S.Ct. 2405 (internal quotation marks omitted).[141]

In order to be successful in a retaliation case the Plaintiff is required to present the following information:  1) that he engaged in a protected act, 2) that he suffered an adverse employment action, and 3) there was causal connection between his participating in a protected act and the adverse employment action.  *Glover v. SLED*, 170 F.3d 411 (4th Cir. 1999) (*See Beall v. Abbott Lab.,* 130 F.3d 614, 619(4th Cir. 1997).

A plaintiff can prove a case of retaliation[142] through the indirect method of proof. *Logan v. Kautex Textron N.A.*, 259 F.3d 635, 638-39 (7th Cir.2001) (*citing Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994)).  The evidence of retaliation permitted under the indirect method is circumstantial evidence; i.e., evidence that allows a jury to infer intentional discrimination by the decision maker. *Gorence v. Eagle Food Ctrs*., Inc., 242 F.3d 759, 762 (7th Cir.2001); *Chiaramonte v. Fashion Bed Group, Inc*., 129 F.3d 391, 396 (7th Cir.1997). Here, plaintiff has shown this.

### a.  The Plaintiff Exhausted her Administrative Remedies.

The Defendant makes the same argument regarding the Plaintiff's claims for retaliation that none were filed with in the 300-day time frame.  However, the Defendant's argument here means even less than previously.  In *Brown v. Runyon*, the Court set forth that retaliation claims

---

[140] *Thompson v. North American Stainless, LP, ___ U.S.___, 131 S. Ct 863, 865(2011)*

[141] *Id.*

[142] *The Troupe decision is also applicable to Title VII, retaliation cases. See Judge Castillo's opinion in Jones v. Elgin, 1998 WL 259538, at \*7-9  (May 13, 1998), attached hereto as Exh. 4, and Judge Aspen's decision in Foster v. Arthur Anderson LLP, 1997 WL 802106, at \*7n.10 (Dec.29, 1997)*

almost always relate back to previously filed EEO charges and are therefore, may be raised for the first time in district court without the requirement that the Plaintiff has exhausted administrative remedies.  The Court further went on to state in adopting the "relation back" rule for retaliation claims, the Nealon court characterized the rule as ". . . the inevitable corollary of our 'generally accepted principle that the scope of a Title VII lawsuit may extend to "any kind of discrimination like or related to allegations contained in the [EEO] charge and growing out of such allegations during the pendency of the case before the Commission."[143]

**b.  The Plaintiff was subjected Retaliatory Actions by the Defendant.**

The Defendant's only argument is to summarily dismiss the Plaintiff's claims as unsupported speculation and conclusory statements.  However, the Defendant fails and refuses to address the actual facts of the Plaintiff's employment which seem to be a theme throughout the Plaintiff's life with USC.  The Defendant failed to investigate her claims, failed to provide a safe environment, failed to address her concerns so why not summarily dismiss her claims at Court they have continuously done so throughout her employment.  All one must do to support that contention is look to the raving comments of Gist regarding his record at USC.

The Plaintiff's claims are not unsupported commentary.  Each act was a retaliatory act against the Plaintiff for her continued participation in reporting discrimination, hostile work environment and retaliation.

1. Arbitrarily transferred to Information Systems under the same Director she made discrimination complaints about;

2. 11/2015 While in Information Systems Isolated her, failed to provide training and not given proper access to data systems to perform her position;

---

[143] 958 F.2d 584 at 590 (quoting Hill v. Western Electric Co., 672 F.2d 381, 390 n. 6 (4th Cir. 1982) (emphasis added) (other quotations and citations omitted)).  Brown v. Runyon, 1998 U.S. App. LEXIS 3237.

3.  5/2016 complaint regarding harassment, work environment, failure to provide training, mediocre assignments and not duties such as her colleagues;

4.  The Plaintiff was demoted in duties and responsibilities when transferred to the Purchasing department-given a job description as an administrative assistant;

5.  The Plaintiff was denied training on the P-card;

6.  Failed to make her a Buyer when others were promoted over the Plaintiff;

7.

The Plaintiff was clearly subjected to retaliation when she describes her work environment as the following:

> My complaints began a systematic transference and demotion of my job, duties and responsibilities. That is when Human Resources decided to take my complaints seriously and transferred me without warning and without consent. I was informed not to return to my desk in Development and told to report to Karen Roberts office. Ms. Roberts had no position for me. I was required to sit in a chair with no desk, duties or responsibilities for a week in her office. The actions of the Defendant were meant to humiliate and embarrass me because of my complaints. After three to four days I was placed in the Controller's Office. While in the Controller's Office the I was placed in an unclean file room and only given the duty of scanning documents into the data base. After being in this humiliating position and complaining to Ms. Edwards, I was then moved to the Employment Office. After being placed in the Employment Office for less than a week, I was approached by Rhonda Edwards and asked if I could envision myself in this department. I informed her that I could, but it would have to be something other than being a receptionist because the duties of a receptionist was not equal to or greater than the position in which I applied and was hired to perform. Ms. Edwards assured me "that this would work out and the employees in this office liked me and she thought it was a good fit and not to worry because I would not be relocated again". A few days later the I was moved again but this time to the Purchasing Department. The Director, Venis Manigo, informed Jamar Mitchell, Karen Roberts and me that they needed help and they would welcome me in the Purchasing Department. Ms. Manigo outlined duties and responsibilities that I would be performing and informed Karen Roberts, Jamal Mitchell, Employee Relations Manager and me that she would train me herself to ensure that I would receive a fair chance to succeed in her office. I never was trained by Ms. Manigo once being placed under her directive. Ms. Manigo said she had no room for the me in her department and informed me that she would have to make room for me. Ms. Manigo spoke well of her department and made it appear that I would be in an environment that worked well together and would welcome me without prejudice. For the first several weeks/month Ms. Manigo suggested I visit with various employees to learn of their role in Purchasing so that I could choose what I wanted

to do.  After 3 months I noticed I was not being assigned duties. I had no real job. I was concerned, and I informed Ms. Edwards.  I told Ms. Edwards ether two things were taking place. Either there was a conspiracy or USC have the worst management staff because it defies logic that this same scenario was happing again. By now, this was no coincidence. When Ms. Manigo would ask me if I liked Purchasing, to which I responded I do but I would like some substantive duties. Ms. Manigo would respond, "I just want you to learn about Purchasing first". I had no idea what that meant as she never trained me as she promised neither did anyone else.   I was tasked with updating names and addresses all day long for the majority of the day for over a year. I was livid! How and why was I given a job description as the Small and Minority Business Coordinator, but Ms. Manigo was having Caleisha Stuckey Hayes perform the duties I was hired to perform in this position. Ms. Stuckey-Hayes was a Manager. Why was she being tasked with performing the duties relating to that of the Program Coordinator? Ms. Manigo and her team invited me to several conferences where I was not provided name tags but everyone else had one upon arrival, I was forced to write my name on my own name tag, once leaving the conferences I never utilized the information gained because I was never afforded the opportunity to perform completely in this role.  Ms. Manigo had Ms. Stuckey-Hayes to facilitate a training for SMB informing the business managers about using the "database" and issues relating to its clean-up and Ms. Hayes never did any of those duties, I did. In this very same meeting, Ms. Manigo referred to me as, "the person who keeps the database clean" rather than the coordinator which was embarrassing and humiliating, yet she praised the work of Ms. Stuckey-Hayes and gave her the credit for all things SMB.  It never dawned on me that I would be given yet another job description but never given the opportunity to perform in the position in which I was hired.  It became clear that this was another last-ditch effort to humiliate me and force me to quit by placing me in an office full of black women who would be considered peers so that I could not claim discrimination. However, what would be the legitimate reason that while under Ms. Manigo's guidance for over a full year, I never received an Employee Performance Appraisal?  Ms. Manigo informed the Assistant VP of Human Resources, Caroline Agardy that I was performing well in her office. When I suggested that Ms. Agardy ask Ms. Manigo exactly what I was performing well, she said Ms. Manigo had no real answers but rather began to make excuses for not giving me substantive duties and not having given me a planning stage or a performance appraisal in over a year, but all of my colleagues had them; both are Title VII violations. I was placed in an office not being used consistently but periodically by the PeopleSoft Team.  Not long after my transfer the offices were renovated. Some individuals were moved.  However, I was not moved.  After being placed in the office no one used consistently, I was harassed by Ms. Manigo to move.  She even promised me new furniture if I would move and stated that Ken Korbett would pay for the furniture out of his budget if I moved.  But I informed her that I would rather remain in the office I was assigned she gave me a choice.   I was informed and overheard several different reasons for me to move: Caleisha Stuckey-Hayes needed a bigger office, they were making it a conference room and Ken Corbet needed it for storage.  Ms. Manigo intentionally harassed me regarding the office I was in creating a hostile work environment.

As a result of my complaints, the same convenient pattern of humiliation via transfer/demotion to a position with limited duties and responsibilities although under different management. The job responsibilities were also significantly different from the

initial position in which I applied and was hired to perform.   The position in Purchasing was basic data entry, updating names, telephone numbers, addresses and business.  This position was not equal to or greater than the job I was hired to perform.

My job purpose set forth when transferred to InfoSystem: "under general supervision, reporting to the Constituent Data and Integrity Manager, the Constituent Records Coordinator performs professional services for central development by updating biographical information in Millennium database from multiple sources for all users. Monitors the Millennium help desk to assist database users by answering calls, responding to emails and in-person inquiries from Millennium users.

On or about July 13, 2016 through August of 2016, I requested a meeting with Terry Perham, University Senior Counsel to inform him that Mr. Gist, Executive Assistant to the President for Equal Opportunity Programs had purposely, willfully and unethically abused his role as by deterring me from filing claims of discrimination for a period of three years and subjected me to a hostile work environment and Retaliation. I further informed him that the Mr. Gist and Ms. Edwards failed to investigate my complaints, never provided me with an investigative report, misled and misguided me as it pertained to the discrimination complaints I filed in his office on October 3, 2014 through June 17, 2016.  Shortly after meeting with Mr. Perham, Mr. Gist suspiciously was no longer employed at the University of South Carolina and it was known within organizations in which he was affiliated that was due to a complaint filed against him.

After my complaints, USC continued the employment of the persons who were discriminatory, made a hostile work environment and racial slurs without discipline.

The Plaintiff has presented a genuine issue of material fact as to the acts by the Defendant being based on her complaints.  The fact remains that the Defendant cannot blame any action taken against the Plaintiff on performance.  At all times the Plaintiff was considered an exemplary employee.

The Plaintiff hereby requests that the Court deny the Defendant's motion for Summary Judgment on her retaliation claims.

**F.  The Plaintiff has Presented a Valid Cause of Action for Hostile Work Environment in Violation of Title VII and Age Discrimination in Employment Act Against the University of South Carolina.**

In *Burlington v. Ellerth*, the court conducted an extensive analysis of hostile work environment and quid pro quo harassment.  Essentially the court set forth the elements of the prima

facie case and the elements of each.[144]  In order to meet the first element of the *McDonnell Douglas*

shifting burden test of a hostile work environment claim, a plaintiff is required to prove four

elements:      (1) the subject conduct was unwelcome; (2) it was based on the sex, race, or national

origin of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions

of employment and to create an abusive work environment; and (4) it was imputable on some

factual basis to the employer.[145]  As to "Hostile environment claims are different in kind from

discrete acts. Their very nature involves repeated conduct.[146] The "unlawful employment practice"

therefore cannot be said to occur on any particular day.  It occurs over a series of days or perhaps

years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on

its own.[147]  Such claims are based on the cumulative effect of individual acts." *Id.*

　　In *National Railroad* the Court determined that there were several factors that must be

observed and analyzed in order to determine if hostile work environment existed, such as "we look

to 'all the circumstances,' including the frequency of the discriminatory conduct; its severity;

---

[144] *"We do not suggest the terms quid pro quo and hostile work environment are irrelevant to Title VII litigation. To the extent they illustrate the distinction between cases involving a threat which is carried out and offensive conduct in general, the terms are relevant when there is a threshold question whether a plaintiff can prove discrimination in violation of Title VII. When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII.  For any sexual harassment preceding the employment decision to be actionable, however, the conduct must be severe or pervasive.  Because Ellerth's claim involves only unfulfilled threats, it should be categorized as a hostile work environment claim which requires a showing of severe or pervasive conduct. See Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998); Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)."  (quoting Burlington v. Ellerth, 524 U.S. 742.)*
[145] *Brown v. Perry, 184 F.3d 388 (4th Cir. 07/14/1999). Equal Employment Opportunity Commission v. R&R Ventures, No. 00-1702 (4th Cir. 04/02/2001).*
[146] *See 1 B. Lindemann & P. Grossman, Employment Discrimination Law 348- 349 (3d ed. 1996) (hereinafter Lindemann) ("The repeated nature of the harassment or its intensity constitutes evidence that management knew or should have known of its existence").*
[147] *.  See Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) ("As we pointed out in Meritor [Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986),] `mere utterance of a . . . epithet which engenders offensive feelings in an employee,' ibid. (internal quotation marks omitted) does not sufficiently affect the conditions of employment to implicate Title VII").*

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

To show that the conduct was sufficiently severe or pervasive, the Plaintiff must establish that the work environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."[148]

When determining whether the harassing conduct was objectively severe and pervasive the court must look at all the circumstances including the frequency of the discriminatory conduct; its severity, whether it is physically threatening or humiliating, or a mere offensive utterance and whether it unreasonably interferes with an employee's work performance.[149]

As set forth in *Harris* the workplace must be permeated with discriminatory intimidation, ridicule and insult.[150]  However, in the same respect as set forth in *Whitten* "conduct that is either pervasive or severe may give rise to a hostile work environment [:]..even one act of harassment will suffice if it is egregious."[151]  The Plaintiff must establish the conditions of her employment were sufficiently altered.[152]  The Plaintiff was subjected daily interaction with individuals that subjected to harassment, bullying and retaliation.

The Plaintiff is required to put forth evidence that both reflects discriminatory attitude toward her and has a nexus with the adverse employment actions.[153]  The nexus is determined by

---

[148] *Faragher, I54 U.S.C. 775, 787 (citing Harris v. Forklift Sys., Inc. 510 U.S. 17, 21-22(1993)).*
[149] *Harris v. Forklift Systems, Inc. 510 U.S. 17, 22, 114 S. Ct. 367, 126 L. Ed. 2d 295(1993)*
[150] *Harris, 510 U.S. at 21.*
[151] *Whitten., 601 F. 3d 231, 243, abrogated on other grounds, Vance v. Ball State University, 133 S.Ct. 2434 (quoting Cerros v. steel Techs, Inc., 398 F. 3d 944, 950 (7th Cir. 2005) emphasis added; see also Faragher 524 U.S. 775, 788 (noting that, while isolated incidents generally do not show an objectively hostile work environment, if a single incident is extremely serious" it may be sufficient to state a claim.)*
[152] *See Hawkins v. PepsiCo, Inc. 203 F.3d 274, 281 2000 U.S. App. Lexi 2036 (4th Cir. 2000).*
[153] *Warsh v. Ohio Cas. Ins. Co. 435 F.3d 510, 520 (4th Cir. 2006).*

context of the statement, temporal proximity to adverse action and the person making the statement.[154]

The Court could deem these as direct evidences of discrimination based on the Plaintiff's age and sex. The Court was clear in *McCray v. Pee Dee Regional Transp. Authority* that "isolated statements can constitute direct evidence of discrimination, but statement must be contemporaneous to the adverse employment action."[155]

Rather than reiterate all facts as presented the Plaintiff would argue that the Defendant's actions against her that created a hostile work environment were in retaliation for her complaints regarding Race and Age Discrimination which is unlawful pursuant to Federal Law. The Defendant against summarily dismisses the Plaintiff's claims without presenting the facts as suffered. It is clear from the record as presented above the Plaintiff was subjected to a severe and pervasive work environment that forced her to take medical leave on several occasions. Based on the Defendant's own recitation of the law the Plaintiff's work environment was permeated with daily actions while in the Information Systems department which even required her direct supervisor to apologize for her uncivil actions.[156]

Based on the actual facts surrounding the Plaintiff's employment the Plaintiff hereby requests that the court deny the Defendant's Motion for Summary Judgment regarding the Plaintiff's Hostile Work Environment Claims. It is clear that the Plaintiff has presented a time line which substantiates her claims for a severe and pervasive work environment that was intentionally hostile based on her complaints, her race and her age.

---

[154] *EEOC v. CTI Global Solutions, Inc.* 815 F. Supp. 2d 897, 906 (D. Md. 2011)
[155] 263 F. App'x 301, 306 (4th Cir. 2008); *Birbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511-512 (4th Cir. 1994) *(finding that evidence of allegedly discriminatory statements made over two years before the discharge of employees was too remote); see Auguster v. Vermilion Parish School Bd.*, 249 Fed 400, 405 (5th Cir. 2001).
[156] *Exhibit 14 to Plaintiff's Response, Email from Gabrielle Barnes.*

### G. The Plaintiff has Presented a Valid Cause of Action for Age Discrimination Employment Act Against the University of South Carolina.

The Age Discrimination in Employment Act was enacted to protect older Americans from the stigmatism of age that their competence and productivity automatically decline with age.[157] The overall theory of the ADEA is that employers are to evaluate an individual on their individual characteristics and merits not on their age.  In order to present a case of discrimination under the ADEA, the Plaintiff may present direct evidence of age as the motivating factor in the employer's decision which would include such evidence as memo directing that all workers over the age of 50 should be laid off.  Absent such direct evidence, the Plaintiff is required to rely on presenting a circumstantial case, which requires the Plaintiff to prove his prima facie case by showing that there is a lack of any reason other than age for action of his employer.  This creates an inference that consideration of the Plaintiff's age was a motivating factor for the termination.  Causey v. Blalog, 162 F. 3d 795, 800 (4th Cir. 1998).[158]

---

[157] *Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993)*

[158] *The element of replacement by someone under 40 fails this requirement. The discrimination prohibited by the ADEA is discrimination "because of [an] individual's age," 29 U.S.C. § 623(a)(1), though the prohibition is "limited to individuals who are at least 40 years of age," § 631(a). This language does not ban discrimination against employees because they are aged 40 or older; it bans discrimination against employees because of their age, but limits the protected class to those who are 40 or older. The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out because of his age. Or to put the point more concretely, there can be no greater inference of age discrimination (as opposed to "40 or over" discrimination) when a 40-year-old is replaced by a 39-year-old than when a 56-year-old is replaced by a 40-year-old. Because it lacks probative value, the fact that an ADEA plaintiff was replaced by someone outside the protected class is not a proper element of the McDonnell Douglas prima facie case.  Perhaps some courts have been induced to adopt the principle urged by respondent in order to avoid creating a prima facie case on the basis of very thin evidence - for example, the replacement of a 68-year-old by a 65-year-old. While the respondent's principle theoretically permits such thin evidence (consider the example above of a 40-year-old replaced by a 39-year-old), as a practical matter it will rarely do so, since the vast majority of age-discrimination claims come from older employees. In our view, however, the proper solution to the problem lies not in making an utterly irrelevant factor an element of the prima facie case, but rather in recognizing that the prima facie case requires " evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion . . . . " Teamsters v. United States, 431 U.S. 324, 358*

The Defendant, USC's only argument is that the Plaintiff's age discrimination complaint should be dismissed because the acts of the Defendant do not constitute adverse employment action sufficient to sustain a claim. However, the Defendant fails and refuses as throughout this argument to consider the facts in a light most favorable to the Plaintiff.

The issue was not related to one training class. The Defendant consistently and overwhelmingly treated younger individuals int eh Purchasing department more favorably including training and promotions. The Plaintiff was not given any duties that were substantial that challenged her in her position. The Defendant consistently allowed younger females in the Purchasing department to be trained, preferential office space, preferential assignments, and preferential jobs. Younger females were promoted to Buyer without any evaluative process and left the Plaintiff out completely.[159]

Consider the position the Plaintiff was supposed to have in Purchasing-Business Diversity Coordinator relating to small, women and minority businesses.[160] Ultimately, when the Plaintiff arrived she was relegated to data entry and administrative assistant duties. Meanwhile, she witnessed other employees being provided exemplary training opportunities and promotions to Buyer.[161] As presented on its face the Plaintiff was treated differently then younger less qualified females. The Plaintiff has presented a genuine issue of material fact as to the treatment she

---

*(1977) (emphasis added). In the age-discrimination context, such an inference cannot be drawn from the replacement of one worker with another worker insignificantly younger. Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class. The judgment of the Fourth Circuit is reversed, and the case is remanded for proceedings consistent with this opinion." O'Conner v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312-316(1996).*
[159] *Exhibit 10 to Plaintiff's Response, Exhibit 3 to Plaintiff's Response.*
[160] *Exhibit 21 to Plaintiff's Response, Manigo's deposition page 21.*
[161] *Exhibit 3 to Plaintiff's Response, Plaintiff's Affidavit, exhibit 10 to Plaintiff's Response, exhibit 4 Time line, Exhibit 21 to Plaintiff's Response, Manigo Deposition.*

received as a result of her age.   The Plaintiff's claims should be presented to a jury for determination.

## VI.    **CONCLUSION**

The Defendants have failed to present the facts in a light most favorable to the Plaintiff. The Defendants have failed to meet the requirements of Rule 56.  The Defendants' own facts relied upon have presented a genuine issue of material fact for a jury to consider. The Defendants purposefully misinterprets the Plaintiff's testimony and specifically puts a dismissive demeaning tone regarding the Plaintiff's claims such as those she suffered at the hands of the Defendants' for the last five years of employment.   It is clear that the Plaintiff has met all the elements regarding discrimination based on race and age, retaliation and hostile work environment.  When reviewing the facts in a light most favorable to the Plaintiff it is clear that there are issues of fact regarding the Plaintiff's performance and the actions of the Defendants.    The Defendants, USC, Gist and Edwards, are not entitled to Summary Judgment.  The Plaintiff hereby urges and requests the Court deny the Defendants' Motion for Summary Judgment.


                              RESPECTFULLY SUBMITTED,

                              s/Bonnie Travaglio Hunt
                              Bonnie Travaglio Hunt
                              Hunt Law, L.L.C.
                              Post Office Box 1845
                              Goose Creek, South Carolina 29445
                              (843)-553-8709
                              Facsimile: (843) 492-5509
October 18, 2018              Email: bthunt@huntlawllc.com