# **TIMELINE**

- Thursday, November 5, 2015 at 11:00a.m. a meeting was held because I requested a Professional Development meeting with my management staff due to a lack of training, isolation and limited database permissions (attached). Clearly there is a discrepancy between this email and the emails I recently received.

- On Thursday, April 28, 2016 at approximately 2:15p.m. prior to Gabrielle Barnes, Constituent Data and Integrity Manager, leaving for the day because she was due to be out of the office on Friday and Monday, Sherry Isenhower informed her of her status with the Call Center updates. Sherry also reminded her that she would also have to download the weekend updates as well on Monday. Gabrielle stated that if necessary, Katrina Smasiact and I could assist with the updates. At approximately 2:30 I informed Gabrielle that I received a large request from Jordan Lehr and informed her that I would be working on his requests while she was out; she briefly reviewed the requests and said ok.

- On Friday morning, April 29, 2016 once logged on to my computer, an email was generated informing everyone that Laura Martin had resigned. Sherry began talking to Katrina about Laura's resignation and as they talked, she walked to Laura's cubicle and said, "Yea she's gone and she took all of her things. She did leave one thing though…hump hump humph…that just aint right. Fishy, fishy, fishy") as she walked back past my cubicle. She and Katrina continued to discuss Laura's departure but I never made a comment. At approximately 9:00a.m., they began discussing the Call

EXHIBIT 4 TO PLAINTIFF'S SUMMARTY JUDGMENT RESPONSE

Center updates informing the other which ones they would do. Then I overheard Sherry say, "Well, Avril can do that one." Not knowing exactly 'which one' she was referring to, I said, "I won't be able to work on that because I have a large file I'm working on." To which, Sherry replied, "Well, it won't get done then!" I did not respond. About 9:30a.m. Loren Thouvenot, Sr. Director, of Gift & Constituent Data, said good morning as she walked past my cubicle and began whispering with Sherry when she reached hers. After whispering with Sherry, Loren then came over and stood slightly behind me and loudly asked, "What are you working on? This question obviously stemmed from Sherry's statement of ("It won't get done") because prior to this day, Loren typically said good morning as she walked past me as she walked to the back to talk with Katrina and Sherry (just Katrina before Sherry was moved to Hampton Street) and she would say goodbye to everyone as she passed me on her way out. Never in over a year and a half has she ever stopped to question what I was working on to the degree she did after Sherry said she wanted help. After showing her what I was working on, Loren subsequently began to question why was I working on the requests (which was odd because for the past year I've been assigned the same task to which never generated any communication from management to this degree) which provided she and Katrina a platform to discuss the requests from Jordan in extreme detail to the point that Katrina volunteered to download part of the requests (There are many instances where I could use Katrina's assistance and she will know that I need it and she will not offer it but, since Sherry was tasked with doing the Call Center and needed help, she volunteered to tell Loren that there was no need for me to perform his requests because she could upload his requests-something I never knew of before). After going back and forth discussing the requests received from Jordan,

EXHIBIT 4 TO PLAINTIFF'S SUMMARTY JUDGMENT RESPONSE

it was decided that Katrina could upload parts of the requests but I would continue and upload the flyer.

- On Tuesday, May 3, 2016, Gabrielle came over to me and asked if I did the Call Center updates. I informed her that I was unable to assist with the updates because of the volume of updates from Jordan, course registrations and other requests that came into the Help Desk that required my attention. She said, "Well, Loren said she told you to do the Call Center." I said, "No she did not and we went back and forth about it. I then said, Gabrielle, you were not here and there was no miscommunication between Loren (as we have miscommunicated before) and me and she was aware that I was working on the requests from Jordan because she and Katrina discussed it prior to telling me what part of the uploads I needed to do for his requests. At approximately 2:30p.m. I went over to Loren and asked did she want me to work on the Help Desk or the Call Center. She asked how many updates I had and I informed her. She then asked if Gabrielle was aware and I said yes at which point she said complete my updates then work on the Call Center updates. (at this point, I am still unsure why I am being asked to neglect my duties to help with Call Center updates).

- On Wednesday, May 4, 2016, Gabrielle came over to me and asked me why did I go over her head by communicating with Loren and asking her which did she want me to work on? I told her I did not go over her head and that she came to me informing me of what she said Loren said and the information she was relaying to me was not accurate. I further explained because she was not part of the communication Loren and I initially had, there was no reason for me to go back and forth with her so I went directly to Loren to remove any ambiguity in regards to what she thought I was working on. I then received an email from

EXHIBIT 4 TO PLAINTIFF'S SUMMARTY JUDGMENT RESPONSE

Loren copying Gabrielle (attached). Gabrielle came to me and asked me did I receive Loren's email and I informed that I was in the process of responding to it (attached). Once I responded to Loren's email Gabrielle came back over to my cubicle and asked that she and I meet in the conference room. She and then went into the conference room where we discussed the events that lead up to my not completing the Call Center updates. During our meeting, I informed her that she and I would have to continue our meeting after I met with Maryann because she had me set for a one on one with her in a few minutes. Gabrielle and I adjourned. As I was walking to my desk, I turned around and saw Loren and Gabrielle head towards Maryann's office with my response to Loren's email. At 10:00a.m. Maryann came to me and asked that my meeting with her be moved to 1:00 p.m. due to some unexpected meetings and I said, "Ok".

- At approximately 10:30a.m. Gabrielle came to my cubicle and said she and Loren wanted to meet with me in Loren's office. I sat down and Loren said, "I have your response to my email and first of all, you never completed the Call Center by yourself." The communication went back and forth then they said they would provide me a copy of what was expected of me as it pertained to my duties and responsibilities and when and how I should log and process updates but the Call Center updates were the priority.

- May 4, 2016 at 3:53p.m. I received an email from Gabrielle copying Loren (attached) outlining my duties and informing me of their expectation of how I was to perform the very duties I have performed exactly as outlined since the day I was relocated to the Info-systems/Data Integrity Department. The email further suggests an undertone of one that is being counseled and threatens that I haven't performed on the level and as if it's necessary to suddenly direct me as such when in fact, I've

EXHIBIT 4 TO PLAINTIFF'S SUMMARTY JUDGMENT RESPONSE

performed these exact duties for the past several months prior to Sherry coming to Hampton Street without ever a word from management and have a performance review that supports that I have performed well within the expectation of what I was tasked to perform. The emails I've received within the past 24 hours all came on the heels of Laura Martin's resignation and Sherry stating that she was not going to perform the Call Center updates if I did not do them (although the Call Center is her primary duty).

\*\*\* As you are aware, there is a long history of issues surrounding tactics that have been used to discourage, isolate, alienate and hold work hostage from me. To capture all the details surrounding these recent events and other acts not mentioned, I would like to discuss questions/concerns in person. The constant unprofessional tactics being used continue to cause me stress and duress and I have patiently and professionally waited for resolve and the responsible parties to be held accountable.

EXHIBIT 4 TO PLAINTIFF'S SUMMARTY JUDGMENT RESPONSE

(wed) at approximately 9:00a.m. after I responded to Loren's email, Gabrielle and I went into the conference room and began to further discuss the communication we were having regarding the Call Center. Gabrielle asked me why did I go over her head and ................................................I informed her that I could not communicate with her too long because Maryann scheduled to meet with me at 10:00a.m.; therefore she and I could continue after I met with Maryann so we adjourned our meeting at approximately 9:30. Before I could go meet with Maryann, I saw Loren and Gabrielle with a copy of my response to Loren's email and they went into Maryann's office for about 30 minutes or longer. When they finally came out, Maryann asked if she and I could meet at 1:00p.m. due to sudden changes in her schedule and I said yes. Loren and Gabrielle then came and asked me to come talk with them in Loren's office. Loren began by saying, "For starter's you never did the Call Center by yourself." (Responding to a comment in my email to her) I said, "I never said I did the call center

EXHIBIT 4 TO PLAINTIFF'S SUMMARTY JUDGMENT RESPONSE

by myself." Gabrielle said, "Yes you did, you said it in your email, Avril." I said, "Gabrielle, you can not show me where I said I did the Call Center by myself in my email. However, what I did say was, "I did the Call Center because that's why I was tasked to do and when I did it, I did the Call Center and the Help Desk simultaneously by myself for at least a year or more and not one time was anyone ever asked to stop what they were doing nor was anyone's job totally realigned and duties taken from them just for them to help me do the Call Center. That's what I said and that is what I meant." They both said, "Yes people were helping you." I said, "Yes, they were, at will but never did I ever hear you all tell anyone to stop what they were doing to help me do it and neither did I ever say to anyone, "it won't get done" (What Sherry said) alluding to not wanting to do it. I did it because that was the duty assigned to me and I did it everyday without complaint and I did what I had to do to get it done." Loren then said, "Well, Gabrielle helped some, Katrina helped some and so did April and

EXHIBIT 4 TO PLAINTIFF'S SUMMARTY JUDGMENT RESPONSE

Laura (two graduate students). After the three of us went around about that, Laura finally said, well, we are restructuring the Help Desk and we need you to help with the Call Center and see what has to be done and what can wait because the Call Center takes priority. Things you don't have to do in the Help Center right away don't do them until after you know the Call Center is caught up. I then informed them both that Sherry said she wasn't doing the Call Center and it seemed to me that they were asking me to do it because she said she didn't want to do it. They both reiterated that it was because the Call Center now takes precedence and the Call Center has to be caught up. Loren then asked me about how things were logged on the spreadsheet and asked that I now log any incoming request upon arrival so that Gabrielle would know exactly what I was working on. Then I was advised complete the course registrations I was working on and when completed, began working on the Call Center updates that Sherry said she would not do on

EXHIBIT 4 TO PLAINTIFF'S SUMMARTY JUDGMENT RESPONSE

Friday, April 29, 2016. After that, the meeting was adjourned and I returned to my desk.

At 1:00p.m. I met with Maryann and she asked me about my current job duties, what I liked and disliked and asked me to show her the processes to certain requests etc., I explained what my duties were and answered her her questions as they pertained to procedural operations so that she understand what each person's function was and what they contributed to the office and that's all we discussed) My meeting with Maryann ended at approximately 2:15p.m. Prior to leaving, I informed her that I would like to speak with her further about other concerns and she said that would be fine.

I left Maryann's Office and met with Mr. Mitchell for my 2:00p.m. appointment to further discuss the incidents with him. On Friday, April 29t I informed him of the incidents right after they occurred. Once back in the office, Maryann sent me an email to stop in to see her if I was available so I did. I

EXHIBIT 4 TO PLAINTIFF'S SUMMARTY JUDGMENT RESPONSE

spoke with her and informed her of my concerns. I informed her about everything already mentioned: See email.... Maryann listened and asked why did I think I was being bulled? She asked would I be happy if she said she was in the process of making better changes and if I would give her an opportunity to change some things although it wouldn't be overnight? I informed her that three years ago, like her, I arrived with such enthusiasm but after being treated unfairly for so long, the enthusiasm slowly dissipates. She asked did I think my feelings of the past affected how I judged the group today? I responded that I didn't agree because the blatant treatment I was speaking about was not due to how I felt because it wasn't about feelings but about what I knew for sure and their latest antics supported my observations. I provided different scenarios to support my view. She then asked, " What if I told you I was not that kind of boss and that I will be changing things, would that make it better? To which I responded, "I doubt it because these issues have gone on for quite sometime

EXHIBIT 4 TO PLAINTIFF'S SUMMARTY JUDGMENT RESPONSE

and being that the antagonizing behaviors started up immediately after Laura's resignation caused me to realize this is who these people are. Also, being that this new set of demands came on the heels of Laura's resignation, left a nasty feeling in my consciousness and gut because it made their recent actions give credence to the claims Laura was making as it pertained to management and the disparaging things Laura said that Barbara and Laura made to her about me in confidence. Once Laura realized I didn't believe her, she began to behave erratically and subsequently resigned. Before Laura informed me that Barbara and Loren told her not to trust me and that they were saying disparaging this to her about me, she confidentially confided in me that financially she was having a difficult time and their constant badgering made her nervous and fearful. When I reflected on that after these recent actions from management, it made sense to me that Laura's behavior could have been out of sheer desperation because she went to Colanda Foster and informed her

EXHIBIT 4 TO PLAINTIFF'S SUMMARTY JUDGMENT RESPONSE

that she was only trying to save my ass and she didn't know why I was being mean to her (because I no longer communicated with her). After sharing everything I could to bring Maryann up to speed about the incident's that occurred over the past few days and the past few years, she asked if I wanted to be seated in a different area and I said yes. She then advised me to give her a chance to make necessary changes that she felt would make everyone happy and said she's planning to strategically align people and job duties so the office is more functional and asked that I allow her an opportunity to make things better. Maryann also said none of these things of the past happened on her shift and there was nothing she could do to change the past and asked what could she do to help me find a position that I would be more excited about. I informed her that part of that was a problem for me too. I informed her that I was hired as a Gift Processor and that I had two successful interviews which resulted in my being offered the position and I was removed from duties I enjoyed performing due to

EXHIBIT 4 TO PLAINTIFF'S SUMMARTY JUDGMENT RESPONSE

unprofessional and hostile behaviors and now in this position, here again, duties are being taken away from me and I'm still in a hostile environment.

EXHIBIT 4 TO PLAINTIFF'S SUMMARTY JUDGMENT RESPONSE

## NATURE OF THE ACTION
### DISCRIMINATION

On May 30, 2013 I was offered the position of Program Coordinator I, in the Development Office as a Gift Processor. From inception, I experienced discrimination based on race under Title VII of the Civil Rights Act of 1964. The various types of discrimination I face(d) under title VII are:

- Based on the color of my skin, I was treated in a discriminatory manner
- Faced stereotypes and assumptions about my ability to perform my duties
- But for my age, these behaviors would not have occurred
- Level of performance was constantly questioned although improper trained
- I was transferred out of the position from which I was hired
- Work assignments were not proportionately distributed
- Placed in isolation and bullied constantly
- Training was provided in a limited, ostentatious, harsh, unprofessional, and hostile manner
- Often provided erroneous answers to questions when asked
- Inappropriately disciplined on the floor in a loud harsh, unprofessional manner around others
- Wage increase was not adjusted for the position in which I was hired, but for the position I currently hold
- Not afforded the privilege to be adequately trained to perform required duties
- The discrimination I face(d) was constant and intentional in nature
- Neutral job policies were put in place to monitor/affect only my performance
- Management exacerbated impediments that arose and cause them to escalate by not addressing less than collegiate behaviors

The moment I arrived in the Office of Development I was being discriminated against and they didn't mind showing it. Darla Smith, Associate Vice President of Advancement Services, informed me that it would take one year for me to gain full knowledge and understanding of my duties and responsibilities and asked that I give myself that amount of time to adjust to the workload. The people that were tasked with training me did so aggressively with attitudes and dogmatic tones only when communicating with me. Each time I experienced behaviors outlined under Title VII, I met with management and addressed my views and concerns regarding the behaviors. My main focus was to make it through my probationary period because I had been warned that every African American person that was in my position/ department prior to me had been fired. Plainly put, I was informed that all persons of color that were previously offered a position in Development were no longer employed because they were '"ran" out of the department. Kelly Cowell, one of the persons tasked with training me, would come to the Mailroom and throw the balancing spreadsheets on the table and loudly exclaim that the work was "wrong!" Actually, the content was correct but she preferred the gridlines used to be larger so

EXHIBIT 4 TO PLAINTIFF'S SUMMARTY JUDGMENT RESPONSE

she would say the entire document was wrong which caused me to waste numerous hours trying to locate an error that was not there. During the first several weeks of my being hired this is the attitude I encountered day in and day out from Kelly until she resigned about 60 days later. Once Kelly resigned, the other colleagues began with their tactics.

Collectively my colleagues had over 30 years of experience as Gift Processors and upon my arrival, I was informed that two people always worked in the mailroom. About nine months after I started working in the mailroom, I was informed that a student would sit with me to open the mail and once the mail was opened and logged, I would remain in the mailroom to work alone until the mailroom duties were completed. Also, prior to my arrival the Foundations was expecting a check for $100,000.00 from a donor and they constantly called inquiring about the check being received. Our office repeatedly stated that the check had not been received. After continuous probing by the Foundations Office, we were asked to stop what we were doing and to go through all the interoffice envelopes in hopes of locating this $100,000.00 check! Well, as it would be, while opening the inter-office envelopes, I found the check and it was dated three months or so prior to my arrival! What a horrible gross negligence by my peers with all this experience! But, if I make as much as a typo, or choose the wrong size gridlines, I was berated for the entire office to hear. But, once the check was found, not a word was said and it was back to business as usual because it was on their shift that the check was overlooked. The comments that have been made about my performance but nothing said about loosing a $100,000.00 check for over 90 days is inexcusable!

When Colanda Foster, a fellow African American colleague and I were at lunch one day, Kelly was about to walk by Colanda asked Kelly why did she decide to resign? Kelly replied, "I'm not teaching "nobody" how to do my job!" Keep in mind, the three people that were hired before me were Caucasian (Daniel Schaffer, Sherry Isenhower and Krisi Duggan) and she aided in their training without resigning. The only word Kelly didn't use in her answer to Colanda was "African American." She didn't want to teach an African American to do the job. At this point the only two people that were African American in Gift Processing were Ardrina Scott-Elliott and I.

After going to management over and over to no avail, I waited until I received my first annual review to break my silence. After a DOD meeting, I approached Karen Roberts, Senior Director, Budget and Human Resources for Development and Alumni Relations. When I approached Mrs. Roberts I was extremely upset from having held the emotions of the discriminatory treatment in for so long. She immediately advised me that she would look into the allegations as she could clearly see the situation had me emotionally upset. Ms. Roberts arranged a meeting for me to meet and inform Jancy Houck, Vice President of Development and Alumni Relations about my concerns. Ms. Houck was unconcerned about the information I was relaying to her and combatively discussed my concerns and retorted, "Some

EXHIBIT 4 TO PLAINTIFF'S SUMMARTY JUDGMENT RESPONSE

people are just straight forward." I relented that straight forwardness was not the issue. Ms. Houck then stated, "Why don't tell Cathey you don't like the way she communicates with you?" I then informed Ms. Houck that Cathey didn't communicate in the same harsh way with the other co-workers and in my opinion, to prevent discord in the workplace, it was best practice to inform management and allow them the opportunity to address the unprofessional and discriminatory behavior of their employees; especially when management was present the majority of the time these behaviors occurred. I could sense from this communication that was not about to happen. The meeting adjourned and shortly thereafter Ms. Mrs. Roberts had an opportunity to look into the allegations, she asked if I was willing to allow her to mediate and speak with Cathey Bickley and me and I said yes. Cathey was the person tasked with training me (the unspoken leader of the group) and when she trained me, she did so in a loud, demeaning and abrasive manner. I agreed to the intervention and was hopeful that it would work. Several weeks later Mrs. Roberts contacted me and asked how were things going and I reported to her that things were going much better. I also sent Cathey an email informing her that I admired her and wanted very much for she and I to get along. Nothing worked with this group because they were all or nothing and everyone was all in and against me and they made sure I knew it. Once it was obvious that something was said about Cathey's behavior, the rest of the group began other demeaning tactics.

Eventually I had no choice but to solicit assistance from the Office of Equal Employment Opportunity where I spoke with Mr. Bobby Gist and Mrs. Rhonda Edwards. After I explained the circumstances surrounding my visit, Mr. Gist assured me that the "unfair" treatment I was experiencing shouldn't be taking place in the work environment and that his office would investigate my claims. At no time was I ever advised that the behaviors were not "unfair" but they were clearly in violation of Title VII of the Civil Rights Act of 1964 and I was absolutely being discriminated against! Mrs. Edwards contacted me and informed me that the investigation was complete and Mrs. Roberts would be contacting me to advise me of the changes that would be taking place.

In October 2014 I was advised that I would be relocated from Gift Processing and placed in Information Systems and I was devastated! Loren Thouvenot, the same Director that refused to address my concerns in Gift Processing was the same Director I would be under in Information Systems and that troubled me. The Information Systems Department was no different than the Gift Processing Department except there were new players who had different faces. Again, I was placed in the same exact situation except the players were different and all I could do was sit back and wait...........After I was shown the location of my desk, I was informed that I would be responsible for performing Call Center updates (which was all I was given to do—Data Entry) everyone else in the department had various duties and responsibilities but I was only given one duty to perform. Everyone in the department, including management, had little to no communication with me the first six months of my arrival. After realizing no one had any intention of communicating with me, I went to Barbara Friendly, Director of Information

EXHIBIT 4 TO PLAINTIFF'S SUMMARTY JUDGMENT RESPONSE

Systems and informed her that I was ready to take on new duties and responsibilities. She said she would give me something to do but I never received anything from her. It wasn't until Laura Dipette resigned that I was given the Help Desk duties. Prior to Laura resigning, she informed me that when she asked Barbara if she could she teach me the Help Desk duties, she was told no.

After several repeated failed attempts to communicate with all areas of management and EEOC to address, cease and desist the behaviors that were constantly being afflicted upon me, it has become necessary that I again state that these acts have been and continue be discriminatory and file the following charge of Discrimination based on Race and Title VII of the Civil Rights Act of 1964.

Please accept these documents as official notification of my filing discriminatory charges against my entire management staff for gross negligence, improper, unprofessional and illegal behaviors pursuant to Title VII of the Civil Rights Act of 1964:

**Jancy Houck**, Vice President for Development and Alumni Relations
**Maryann Melio**, Assistant Vice President for Operational Resources and Support
**Loren Thouvenot**, Senior Director of Gift Administration and Information Systems
**Barbara Friendly**, Director of Information Systems
**Gabrielle Barnes**, Data and Integrity Manager
**Ashley Maciaszek**, Former Manager of Gift Administration

Please accept these documents as official notification of my filing discriminatory charges against my colleagues for gross negligence, improper, unprofessional and illegal behaviors pursuant to Title VII of the Civil Rights Act of 1964:

**Cathey Bickley**, Gift Processor
**Kelly Cowell**, Gift Processor
**Michael Bates**, Gift Processor
**Krisi Duggan**, Gift Processor
**Sherry Isenhower**, Gift Processor
**Kristina Smaciack**, Information Systems
**Michael Allen**, Report Writer

In summation, please review the totality of the attached emails provided as well as emails submitted in 2013- today for full detail of all reported incidents. Once you review this packet, you will be able to ascertain that history shows a broad pattern of racial discriminatory actions toward me from my management staff and colleagues.

EXHIBIT 4 TO PLAINTIFF'S SUMMARTY JUDGMENT RESPONSE